**RECORD NO. 14-1135**

# IN THE
# 𝕌nited 𝕊tates �ℂourt of 𝔸ppeals
## FOR THE FOURTH CIRCUIT

————————————

BRYANT MOORE,

*Plaintiff - Appellant,*

v.

LIGHTSTORM ENTERTAINMENT, INC.;
JAMES CAMERON;
TWENTIETH CENTURY FOX FILM CORPORATION,

*Defendants - Appellees.*

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Roger W. Titus, Senior, U.S. District Court Judge)

————————————

### OPENING BRIEF OF APPELLANT

————————————

Bruce S. Rogow
Tara A. Campion
BRUCE S. ROGOW, PA
500 E. Broward Blvd., Suite 1930
Ft. Lauderdale, FL 33394
(954) 767-8909
brogow@rogowlaw.com
tcampion@rogowlaw.com

Bradley A. Thomas
THE LAW OFFICE OF
BRADLEY A. THOMAS
1629 K Street, N.W., Suite 300
Washington, DC 20006-1631
(202) 289-7574
batlaw@bradleythomaslaw.com

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____        Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO


2.      Does party/amicus have any parent corporations?                      YES      NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:



3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                              YES      NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
        financial interest in the outcome of the litigation (Local Rule 26.1(b))?        YES    NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)     YES    NO
        If yes, identify any publicly held member whose stock or equity value could be affected
        substantially by the outcome of the proceeding or whose claims the trade association is
        pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                           YES    NO
        If yes, identify any trustee and the members of any creditors' committee:

Signature: _____        Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE
**************************
I certify that on _____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

_____        _____
        (signature)                                      (date)

- 2 -

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT

TABLE OF CASES, STATUTES AND AUTHORITIES ..................................... iii

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION .....1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................................2

    1. DID THE DISTRICT COURT ERR IN GRANTING SUMMARY JUDGMENT AGAINST BRYANT MOORE, FINDING THAT THERE WAS NO GENUINE ISSUE OF MATERIAL FACT ON THE ISSUES OF ACCESS AND SUBSTANTIAL SIMILARITY? ...................................................................2

STATEMENT OF THE CASE ................................................................................3

    Statement of the Facts .....................................................................................4

        a. Undisputed (with some caveats) ............................................................5

        b. Disputed ..................................................................................................6

SUMMARY OF ARGUMENT ...............................................................................7

ARGUMENT ...........................................................................................................8

  I.    THE SUMMARY JUDGMENT IN FAVOR OF APPELLEES SHOULD BE REVERSED ............................................................................8

    A.    Standard of Review: The Scope of *De Novo* Review ............................8

    B.    The Tests to Be Applied .......................................................................12

    C.    Applying *De Novo* Review To This Case ............................................14

        1.  Access ...........................................................................................14

        2.  Substantial Similarity ..................................................................17

            a.  *Pollination* and *Avatar* ..................................................21

            b.  *Aquatica* and *Avatar* ....................................................28

  II.    THE ERRORS BELOW .........................................................................34

i

CONCLUSION ................................................................................36

REQUEST FOR ORAL ARGUMENT ........................................................36

CERTIFICATE OF COMPLIANCE........................................................37

CERTIFICATE OF SERVICE ...........................................................38

# TABLE OF AUTHORITIES

## Cases

*Amini Innovation Corp. v. Anthony California, Inc.*
  439 F.3d 1365 (Fed Cir. 2006) ...................................................................9

*Anderson v. Liberty Lobby*
  477 U.S. 242 (1986).................................................................................8, 9

*Arnstein v. Porter*
  154 F.2d 464 (2d Cir. 1949) .......................................................................10

*Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*
  132 F.3d 1017 (4th Cir. 1997) .....................................................................8

*BCD LLC v. BMW Manuf. Co., LLC*
  No. 08-1279 (4th Cir. 2010) .........................................................................8

*Berkic v. Crichton*
  761 F.2d 1289 (9th Cir. 1985) ....................................................................18

*Boisson v. Banian,* Ltd.
  273 F.3d 262 (2d Cir. 2001) ......................................................................19

*Bouchat v. Baltimore Ravens, Inc.*
  228 F.3d 489 (4th Cir. 2000) .....................................................................34

*Dawson v. Hinshaw Music Inc.*
  905 F.2d 731(4th Cir. 1990) .........................................................12, 13, 33

*Feist Publications, Inc. v. Rural Telephone Service Co.*
  499 U.S. 340 (1991)....................................................................................12

*Gray v. Spillman*
  925 F.2d 90 (4th Cir. 1991) ..........................................................................9

*Heyman v. Commerce & Industry Ins. Co.*
  524 F.2d 1317 (2d Cir. 1972) .....................................................................11

iii

*Hill v. Lockheed Martin Logistics Mgmt., Inc.*
354 F.3d 277 (4th Cir. 2004) ........................................................................8

*Kelly Van v. James Cameron*
10-cv-01051-ABJ-WVG (Southern District of California, 2011) ...............30

*Lyons Partnership, L.P. v. Morris Costumes, Inc.*
243 F.3d 789 (4th Cir. 2001) ......................................................................27

*Meta Film Assoc. v. MCA, Inc.*
586 F.Supp 1346 (D.C.Cal. 1984) ...............................................................34

*Metcalf v. Bochco*
294 F.3d 1069 (9th Cir. 2002) .....................................................................18

*Moore [Derrick] v. Columbia Pictures Industries, Inc.*
972 F. 2d 939 (8th Cir. 1992) ......................................................................17

*Narell v. Freeman,*
872 F.2d 907, 911 (9th Cir. 1989) ...............................................................33

*Perini Corp. v. Perini Constr. Inc.*
915 F.2d 121 (4th Cir. 1990) .........................................................................8

*Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*
274 F.2d 487 (2d Cir. 1960) ...................................................................33-34

*Repp & K&R Music, Inc. v. Webber*
132 F.3d 882 (2nd Cir. 1997) ........................................................................9

*Runge v. Lee*
441 F.2d 579 (9th Cir. 1971) .......................................................................19

*See v. Durang*
711 F.2d 141 (9th Cir. 1983) .......................................................................18

*Sheldon v. Metro-Goldwyn Pictures Corp.*
81 F.2d 49 (2d Cir. 1936) ............................................................................11

*Sid & Marty Krofft Television v. McDonald's Corp.*
        562 F. 2d 1157 (9th Cir. 1977) ...................................................13, 17, 19, 34

*Swirsky v. Carey*
        376 F.3d 841 (9th Cir. 2004) ........................................................................9

*Towler v. Sayles*
        76 F.3d 579 (4th Cir. 1996) ...................................................................12, 16

*Universal Pictures Co., Inc. v. Harold Lloyd Corp.*
        162 F.2d 354 (1947) .....................................................................................20

*Williams v. Crichton,*
        84 F.3d 581, 588 (2d Cir. 1996) ...........................................................18-19

*Williams v. Kaag Mfrs., Inc.*
        338 F.2d 949 (1964) ......................................................................................20

**Statutes**

Title 17 U.S.C. § 101 ..........................................................................................4, 33
Title 17 U.S.C. § 102(a)(5) .....................................................................................33

**Rules**

Fed. R. Civ. P. 56 .................................................................................................8, 14

**Other Authority**

Shick, Marvin, JUDICIAL RELATIONS IN THE SECOND CIRCUIT, 1941 – 1951
        44 N.Y.U. L.Rev., 939 (1969) ....................................................................10

Roodhuyzen, Nicole K., DO WE EVEN NEED A TEST? A REEVALUATION OF
ASSESSING SUBSTANTIAL SIMILARITY IN A COPYRIGHT INFRINGEMENT CASE
        15 Journal of Law & Policy, 1375 (2007) ...................................................13

Lippman, Katherine, COMMENT, THE BEGINNING OF THE END: PRELIMINARY
RESULTS OF AN EMPIRICAL STUDY OF COPYRIGHT SUBSTANTIAL SIMILARITY
OPINIONS IN THE U.S. CIRCUIT COURTS
        2013 Mich. St. L. Rev., 513 (2013) ....................................................... 13-14

## STATEMENT OF SUBJECT MATTER AND
## APPELLATE JURISDICTION

This is an appeal from a final order granting summary judgment in favor of the Defendants entered on January 17, 2014, United States District Court for the District of Maryland (Roger W. Titus). Jurisdiction of the District Court was based on 28 U.S.C. § 1331. The decision below is reported at --- F.Supp.2d ----, 2014 WL 201579 (D.Md. 2014).

This Court has jurisdiction pursuant to Title 28 U.S.C. § 1291. The notice of appeal was filed in the District Court on February 14, 2014.

**STATEMENT OF THE ISSUE PRESENTED FOR REVIEW**

1. DID THE DISTRICT COURT ERR IN GRANTING SUMMARY JUDGMENT AGAINST BRYANT MOORE, FINDING THAT THERE WAS NO GENUINE ISSUE OF MATERIAL FACT ON THE ISSUES OF ACCESS AND SUBSTANTIAL SIMILARITY?

## STATEMENT OF THE CASE

This is an appeal from an order granting summary judgment to "individuals and entities involved in creating the film *Avatar*." JA 4516.[1] The Plaintiff, Bryant Moore, "a science fiction writer who has written several original works" (JA 4515), asserted "that his copyrighted works pre-date the *Avatar* screenplay and that there is substantial similarity between his copyrighted works and *Avatar*, such that the film and its screenplay infringe his copyrights." JA 4516.

The court below concluded, on summary judgment, that the film *Avatar* did not infringe upon Moore's copyrights in *Aquatica* and *Pollination* and that no reasonable jury, properly instructed, could find that they were substantially similar. That decision is subject to a *de novo* review on appeal.

---

[1] Appellant collaborated with Appellees to submit a Joint Appendix. References to documents contained within the Joint Appendix will be identified by "JA." However, due to the voluminous nature of the Joint Appendix, many documents contained in the Record below were omitted and will be referenced by Docket Number, "DE."

## STATEMENT OF THE FACTS

Appellant Bryant Moore is a science fiction writer and author of *Aquatica* and *Descendants: The Pollination* (*Pollination*). JA 27. *Aquatica* was written in 1992 and registered with the U.S. Copyright Office in 1994. *Id*. *Pollination* was written in 2002 and registered in 2003. *Id*. *Aquatica* was later revised and re-registered in 2006 under the title *Aquapocalypse: Aquatica*. JA 31. The parties do not dispute that for all times relevant to this appeal, Moore holds valid copyrights in both works, pursuant to Title 17 U.S.C. § 101 *et seq*. JA 4519.

The Appellees are individuals and entities involved in purportedly writing, producing, and distributing the film *Avatar*. JA 29. James Cameron is a writer, producer, and director who Defendants assert wrote *Avatar*. *Id*. Cameron is also the principal owner of Lightstorm Entertainment. *Id*. The film *Avatar* was released to theaters in December 2009. JA 30.

The following facts are taken from the "Defendants' Response to Plaintiff's 'Genuine Statement of Material Facts to Which There Are No Dispute.'" DE 166-1. Since the key to this case is whether there were genuine issues of material fact viewed in the light most favorable to Moore, the argument portion of this Brief also addresses the numerous disputed facts relating to the essential elements of the case: access and substantial similarity. Here we provide the preview of the coming attraction.

4

a) **Undisputed (with some caveats)**

In January 2003, the Director's Guild of America provided Moore with contact information for James Cameron's business manager at the time. Moore sent a copy of *Aquatica* to that entity.[2]  DE 166-1, ¶ 4.

Cameron's business manager referred Moore to Lightstorm where Moore had contacted Tom Cohen, following which Moore, through his lawyer, sent *Aquatica* to Cohen. *Id*. ¶ 8. On April 21, 2003, Tom Cohen created an entry on Lightstorm's electronic file database for it, and assigned one of Lightstorm's readers to create "script coverage" for *Aquatica*. *Id*. ¶ 9. That reader, James Coffee, then provided Lightstorm with the coverage of *Aquatica* on May 1, 2003, which is reflected in their electronic database. *Id*. ¶ 10. Moore discussed the screenplay with Cohen. *Id*. ¶ 11.

On July 30, 2003, Moore, through his counsel, sent *Pollination* to Cohen. DE 166-1, ¶ 14. On August 1, 2003, Cohen created an entry on Lightstorm's electronic database for *Pollination*, and again assigned Coffee to create "script coverage" for it. *Id*. ¶ 15. He did, and that was reflected in Lightstorm's electronic database. *Id*. ¶ 16.

---

[2]    Looking at DE 166-1, the Court will see that the Defendants "disputed" the date of when it was sent, but not *that* it was sent. We have tried to cull from the Defendants' "disputes," here and elsewhere, the heart of the undisputed matter, putting aside the non-substantive quibbles. There was also evidence that Lightstorm had access to *Aquatica* in 1994. *See note* 6, *infra*.

5

For hard copy script submissions, Lightstorm arranged them in alphabetical order in its "script library." DE 166-1, ¶ 20. The "script library" was 80 feet from Cameron's office and near Lightstorm Executive Officer Jon Landau's office.[3] *Id*. ¶ 22. Cohen testified that "[t]here were weekly meetings that would be held, usually with Rae Sanchini, and later on with Landau, and in those meetings if there were any projects that were deemed interesting to bring to Jon or Rae's attention, those projects would be discussed or brought up in the meeting. *Id*. ¶ 24.

### b) **Disputed**

The true dispute is over the facts related to substantial similarity. We address those in the Argument, *infra*, but we point the Court to the "Response," DE 166-1, pp. 9-12, which catalogue the Defendants' Response to the Plaintiff's assertion of "striking and/or literal similarities between Plaintiff's protected works and *Avatar*." The critical point is that, according to the Defendants, the works "speak for themselves." *Id*. ¶ 26 (Defendants' Response).

Against that background, we turn to the argument, and the disputed issues of fact, i.e., whether the works "say" that reasonable people could disagree over whether *Avatar* is "substantially similar" to *Aquatica* and *Pollination*.

---

[3]     Cohen testified to the 80 feet distance between the "script library" and Cameron's office, but Defendants' disputed the asserted fact, relying, *inter alia*, on a "Cohen Errata-Sheet" to his deposition. As to "80 feet" Defendants do not deny the distance, only whether that was "close proximity." DE 166-1, ¶ 8.

## SUMMARY OF THE ARGUMENT

The summary judgment entered below failed to acknowledge the genuine issues of material fact both as to the Defendants' access to Bryant Moore's copyrighted works, and the substantial similarities between Moore's works and the Defendants' *Avatar*. Furthermore, the decision below failed to properly apply the legal principles that guide the inquiries of access and substantial similarities.

The doctrines of "reasonable possibility" of access and "corporate receipt," applied to the undisputed facts in this case should have precluded summary judgment on that front, and to the extent that there were any disputed facts, those disputes added to the reasons summary judgment was improper.

On the substantial similarity front, the extrinsic and intrinsic tests for judging similarities and copyright violations were passed with flying colors by the Plaintiff, but the court below overlooked, played down, or mischaracterized the similarities of plot, setting, characters, dialogue, mood and pace which permeated *Avatar*; similarities from which a reasonable jury could have concluded that *Avatar* pirated much from Moore. At the least, the disputes about the nature of the similarities and their import, precluded summary judgment against Moore.

The standard of review is de novo, and the standard for summary judgment requires a court to view the facts, and the disputed facts, in the light most favorable to the party opposing summary judgment. The court below failed to do that. On

review, this Court should conclude that summary judgment was not appropriate and reverse with directions to the court below to allow this case to be tried by a jury.

## I.

## THE SUMMARY JUDGMENT IN FAVOR
## OF APPELLEES SHOULD BE REVERSED

**A.    Standard of Review: The Scope of *De Novo* Review**

A grant of summary judgment is reviewed *de novo* on appeal, applying the same Rule 56 standard used by the trial court, but without deference to the trial court. *Perini Corp. v. Perini Constr. Inc*., 915 F.2d 121, 123 (4th Cir. 1990). The Rule 56 standard requires that this Court review the record as a whole in the light most favorable to Moore, the nonmoving party, to determine whether there was a genuine issue of material fact on the essential elements, i.e., access and substantial similarity. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-50 (1986); *Hill v. Lockheed Martin Logistics Mgmt., Inc*., 354 F.3d 277, 284 (4th Cir. 2004) (*en banc*). A material issue of fact exists if a reasonable jury could find for the plaintiff on those necessary elements. *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1027 (4th Cir. 1997); *see also BCD LLC v. BMW Manuf. Co., LLC*, No. 08-1279, slip op. at 9-10 (4th Cir. 2010) (unpublished).

8

In a copyright infringement action, summary judgment is improper when "reasonable minds could differ on the issue of substantial similarity." *Amini Innovation Corp. v. Anthony California, Inc.*, 439 F.3d 1365, 1368 (Fed Cir. 2006). Summary judgment can only be upheld if "no reasonable juror could find substantial similarity of ideas and expression . . . . viewing the evidence in light most favorable to the non-moving party." *Swirsky v. Carey*, 376 F.3d 841, 844 (9th Cir. 2004) (if plaintiff presented "indicia of a sufficient disagreement concerning the substantial similarity of [the] two works, then the case must be submitted to a trier of fact." (internal quotations and citations omitted)). On appeal, this Court must resolve all ambiguities and draw all inferences in favor of Moore, the nonmoving party. *Repp & K&R Music, Inc. v. Webber*, 132 F.3d 882, 889 (2nd Cir. 1997).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . ." *Anderson v. Liberty Lobby*, *supra* at 255 (emphasis supplied); *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991).

Nearly 70 years ago the Second Circuit addressed a summary judgment against a Plaintiff alleging that Cole Porter plagiarized *Begin the Beguine* and *My Heart Belongs to Daddy*. *Arnstein v. Porter*, 154 F.2d 464 (2d Cir. 1949). Judge Frank's words reversing the summary judgment there are apropos here:[4]

> We should not overlook the shrewd proverbial admonition that sometimes truth is stranger than fiction.
>
> \*\*\*
>
> If, after hearing both parties testify, the jury disbelieves defendant's denials, it can, from such facts, reasonably infer access. It follows that, as credibility is unavoidably involved, a genuine issue of material fact presents itself. With credibility a vital factor, plaintiff is entitled to a trial where the jury can observe the witnesses while testifying. Plaintiff must not be deprived of the invaluable privilege of cross-examining the defendant – the "crucial test of credibility" – in the presence of the jury. Plaintiff, or a lawyer on his behalf, on such examination may elicit damaging admissions from defendant; more important, plaintiff may persuade the jury, observing defendant's manner when testifying, that defendant is unworthy of belief.
>
> \*\*\*
>
> The question, therefore, is whether defendant took from plaintiff's works so much of what is pleasing to the ears of lay listeners, who comprise the audience for whom such popular music is composed, that defendant

---

[4] The in-fighting on this case between Judge Frank and Judge Clark, two iconic figures on the Second Circuit Court in the forties, is recounted in 44 N.Y.U. L.Rev., 939, 944 (1969), Marvin Shick, JUDICIAL RELATIONS ON THE SECOND CIRCUIT, 1941 – 1951. Judge Frank and his secretary heard similarities, and Judge Clark and his secretary, law clerk, and his friend who was the Yale organist, heard no similarities. The postscript is that Arnstein lost at trial, and the Court of Appeals affirmed, *per curiam*. *Arnstein v. Porter*, 158 F.2d 795 (2d Cir. 1946).

> wrongfully appropriated something which belongs to the plaintiff.
>
> &ast;&ast;&ast;
>
> The plaintiff may call witnesses whose testimony may aid the jury in reaching its conclusion as to the responses of such audiences. Expert testimony of musicians may also be received. . . .

*Id*. at 469 – 473.[5]

De novo is a Latin expression meaning 'anew' or 'from the beginning'. On appeal, the appellate court does not defer or yield to the trial court's decision. In this case that means this Court must independently evaluate the record to determine whether, whatever inventive additions may have appeared in the movie *Avatar*, the *Aquatica* and *Pollination* scripts contained sufficient extrinsic similarities in plot, theme, dialogue, mood, setting, pace and sequence, that a reasonable jury, properly instructed, could find that Lightstorm infringed Moore's copyrighted works.

In making that evaluation, the focus must be on the similarities between the works and not their differences, because "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir. 1936).

---

[5]    While *Arnstein's* 'slightest doubt' view is no longer the test (*Heyman v. Commerce & Industry Ins. Co.*, 524 F.2d 1317, 1319 (2d Cir. 1972), the need for a high and undisputed quantum of evidence is still the *sine qua non* for summary judgment. The Defendants did not meet that standard here.

**B.**    **The Tests To Be Applied**

Proving infringement requires proof of ownership of a copyright and proof that a defendant copied protected elements of the copyrighted work. *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 361 (1991). Moore's Copyright ownership is not in issue here. JA 4519. To prove copying, absent direct proof, a plaintiff must introduce evidence of access to the copyrighted work and substantial similarity between the original and derivative work.

*Towler v. Sayles*, 76 F.3d 579 (4th Cir. 1996) and *Dawson v. Hinshaw Music Inc.*, 905 F.2d 731(4th Cir. 1990) are the touchstone cases:

> Towler can raise a presumption of copying by showing both that Sayles had access to "Crossed Wires" and that the two screenplays in question are substantially similar. *Dawson v. Hinshaw Music Inc.*, 905 F.2d 731, 732 (4th Cir. 1990).
>
>      To prove access, Towler must show that Sayles had an opportunity to view or copy her work. *Nimmer on Copyright,* §13.02[A], at 13-16. A mere possibility that such an opportunity could have arisen will not suffice. Rather, it must be reasonably possible that the paths of the infringer and the infringed work crossed. *Moore v. Columbia Picture Industries, Inc.*, 972 F. 2d 939, 942 (8th Cir. 1992).
>
> ***
>
>      A court may infer that the alleged infringer had a reasonable possibility of access if the author sent the copyrighted work to a third party intermediary who has a close relationship with the infringer.

*Towler*, 79 F.3d at 581-585, 583.

*Towler* sets the stage for the substantial similarity inquiry:

> First, a plaintiff must show – typically with the aid of expert testimony – that the works are extrinsically similar because they contain substantially similar ideas that are subject to copyright protection. Second, a plaintiff must satisfy the subjective, or intrinsic portion of the test by showing substantial similarity in how those ideas are expressed. *Dawson*, 905 F.2d at 722-33. This portion of the test considers whether the intended audience could determine that the works are substantially similar, usually without the aid of expert testimony. In this case, the intended audience is the movie-going public.

*Id*. at 583-584.

Commentators have questioned the extrinsic/intrinsic test, which this Court took from the Ninth Circuit decision in *Sid & Marty Krofft Television v. McDonald's Corp.*, 562 F. 2d 1157 (9th Cir. 1977); *Dawson*, 905 F.2d at 734.

> The extrinsic/intrinsic test has been widely criticized even by the very court that created it. The major criticism of the test is that it is hard to understand and not easy to apply. The Ninth Circuit has recognize the difficulties of applying the test and in *Metcalf v. Bocko,* [294 F.3d 1069 (9th Cir. 2002)] described the extrinsic test as "turbid waters".

15 Journal of Law & Policy, 1375, 1401 (2007), Nicole K. Roodhuyzen, Do WE EVEN NEED A TEST? A REEVALUATION OF ASSESSING SUBSTANTIAL SIMILARITY IN COPYRIGHT INFRINGEMENT CASES. *See also*, 2013 Mich. St. L. Rev. 513, 531 (2013), Katherine Lippman, COMMENT, THE BEGINNINGS OF THE END:

13

PRELIMINARY RESULTS OF AN EMPIRICAL STUDY OF COPYRIGHT SUBSTANTIAL SIMILARITY OPINIONS IN THE U.S. CIRCUIT COURTS.

There is a split among the Circuits as to the test for substantial similarity to be applied, with some Circuits following the Second Circuit's "Ordinary Observer Test." *See* Roodhuyzen, *supra* at 1388-1412. The lesson is that a summary judgment on substantial similarity is tricky business and appellate review is equally delicate.

The admixture of *de novo* review, the Rule 56 standards for summary judgment, and the murky meanings of a test for "substantial similarity" means that a reviewing court must be careful to avoid denying a plaintiff his or her Seventh Amendment right to a jury trial.

## C.    Applying *De Novo* Review To This Case

### 1.    Access

The Defendants' assertion is that "Cameron completed the *Avatar* story no later than March 1996, seven years before Plaintiff submitted his scripts to Lightstorm in 2003," and therefore "Cameron could not possibly have copied in 1996 scripts that would not be submitted to Lightstorm until seven years later. . . ." DE 118 at 9-10.

14

The Defendants stress this "access" argument because they are in trouble once – undisputedly – Moore sent his scripts to Lightstorm, and Tom Cohen admitted having received both *Pollination* and *Aquatica*. JA 4741. As we show below, there can be no doubt of disputed facts *vis a vis* access from 2003 on, but Cameron's claim of pre-2003 creation of *Avatar* is belied, or at least disputed, by multiple facts.

First, there are issues about both what (and when) Cameron "created" in 1996. Cameron claimed he wrote "a lengthy scriptment for *Avatar*" and submitted it to Twentieth Century Fox in that year. JA 402. But in 2007 and 2008, when copyright applications were filed with the United States Copyright Office for "Project 880" (the *Avatar* screenplay), the applications did not reflect any use of Cameron's scriptment, despite the obligation to do so. JA 1800-1801. The initial application required the applicant to "Identify any preexisting work or works that this work is based on or incorporates." *Id*. No reference is made to any prior works of Cameron. *Id*. A year later, the Project 880 copyright application was amended and referenced "screenplay treatment by James Cameron entitled *Avatar* (registration unknown)." DE 157-30.

Thus, Cameron's claims to a scriptment that constituted an independent creation is placed in serious doubt by the 2007 and 2008 copyright applications which fail to confirm that Cameron's 1996 scriptment was an independent creation

15

which foreclosed any further inquiry into access. Indeed, while there was testimony that as early as 1994 Moore gave the *Aquatica* script to a person who went to Lightstorm's office for a job interview,[6] there is no question that four or five years before *Avatar's* copyright registration, Lightstorm was in full possession of both *Aquatica* and *Pollination*.

That fact, combined with the substantial similarities (see below) made summary judgment inappropriate. Substitute Moore for Towler and Cameron for Sayles:

> To prove access, Towler must show that Sayles had an opportunity to view or to copy her work. . . . [I]t must be reasonably possible that the paths of the infringer and the infringed works crossed. *Moore v. Columbia Picture Industries, Inc.*, 972 F.2d 939, 942 (8th Cir. 1992).

*Towler*, 76 F.3d at 582.

The undisputed fact is that by 2003, Moore's original works were 80 feet away from Cameron; they had been logged in by Lightstorm's Tom Cohen; they had been assigned to a reader; they were in Lightstorm's electronic database (*see*

---

[6]    That person, Howard Gibson, received *Aquatica* in May 1994 and discussed the screenplay and how to get it made into a motion picture. Gibson went to Lightstorm's office in Santa Monica and met with a sandy haired white male in his late twenties or early thirties who met the description of Tom Cohen, assistant to Lightstorm's Development Executive, who later became Lightstorm's Creative Executive. Gibson testified that he gave the script to "somebody," and discussed it with a woman who worked with him at Omega Sector, the Cameron owned LLC for *True Lies*. *See generally* DE 152 at 12-15 (Plaintiff's Opposition to Defendants' Motion for Summary Judgment).

16

Statement of Facts, *supra*); they were physically in the "script library;" combined

with the "corporate receipt doctrine," makes summary judgment improper.

"A reasonable possibility of access can be established under the 'corporate

receipt doctrine.'" *Moore* [*Derrick*] *v. Columbia Pictures Industries, Inc*., 972 F.

2d 939, 942 (8th Cir. 1992).

> If the defendant is a corporation, the fact that one
> employee of the corporation has possession of plaintiff's
> work should warrant a finding that another employee
> (who composed defendant's work) had access to
> plaintiff's work, where by reason of the physical
> propinquity between the employees the latter has an
> opportunity to view the work in the possession of the
> former.

*Id*.

*Moore* cites cases applying the corporate receipt doctrine to upend summary

judgments on access. *Id*. at 944-45. Bryant Moore should be added to that list. As

in Derrick Moore's case, "the district court erred in holding as a matter of law that

[defendants] did not have a reasonable possibility of access to [the allegedly

infringed works]." *Id*. at 945.

## 2.   <u>Substantially Similar</u>

Derrick Moore failed the two-step substantial similarity analysis –

substantial similarity "'not only to the general ideas but of the expression of those

ideas as well.'" *Moore* at 945, quoting *Sid & Marty Krofft Television Prods. Inc.,*

*v. McDonald's Corp*., 562 F.2d 1157, 1164 (9th Cir. 1977).

17

Bryant Moore passes the test, at least under the summary judgment standard, and its application on *de novo* review. "General plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind." *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985). Nor does copyright law protect "*scenes a faire*," or scenes that flow naturally from unprotectable basic plot premises. *Id*.; *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). But protectable expression does include the specific details of an author's rendering of ideas, or "the actual concrete elements that make up the total sequence of events and the relationships between the major characters." *Berkic*, 761 F.2d at 1293.

> [T]he presence of [] many generic similarities and the common patters in which they arise do . . . satisfy the extrinsic test. The particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element. Each note in a scale, for example, is not protectable, but a pattern of notes in a tune may earn copyright protection. A common 'pattern that is sufficiently concrete . . . warrants a finding of substantial similarity.' *Shaw* [*v. Lindheim*], 919 F.2d [1353 (9th Cir. 1990)] at 1363; *see id*. ("Even if none of these common plot elements is remarkably unusual in and of itself, the fact that both works contain all of these similar events gives rise to a triable question of substantial similarity of protected expression."); *id.*

*Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002).

As well, the law is clear that dissimilarity does not preclude a finding of substantial similarity. In *Williams v. Crichton*, the court noted:

18

When we determine that a work contains both protectable and unprotectable elements, we must take care to inquire only whether 'the protectable elements, standing alone, are substantially similar.' *Knitwaves, Inc. v. Lollytogs Ltd.*, 72 F.3d 996, 1002 (2d Cir. 1995); *see also Fisher-Price,* [*Inc. v. Well-Made Toy Mfg. Corp.*] 25 F.3d [119 (2d Cir. 1994)] at 123. *We also must recognize that dissimilarity between some aspects of the works will not automatically relieve the infringer of liability, for 'no copier may defend the act of plagiarism by pointing out how much of the copy he has not pirated.' Rogers v. Koons*, 960 F.2d 301, 208 (2d Cir.), cert. denied, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). It is only when the similarities between the protected elements of plaintiff's work and the allegedly infringing work are of 'small import quantitatively or qualitatively' that the defendant will be found innocent of infringement.' *Id.*; *see also* 3 *Nimmer on Copyrights, supra*, § 13.03[B][1][a].

84 F.3d 581, 588 (2d Cir. 1996) (emphasis supplied).

*Boisson v. Banian,* Ltd., 273 F.3d 262, 273 (2d Cir. 2001), said this: "[W]hen evaluating claims of infringement involving literary works, we have noted that while liability would result only if the protectable elements were substantially similar, our examination would encompass 'the similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting of the plaintiff's books and the defendants' works'" quoting *Williams v. Crichton,* 84 F.3d 581, 588 (2d Cir. 1996); *see also Sid & Marty Krofft v. McDonalds Corp.*, 562 F.2d 1175 (1977). Duplication or near identity is not necessary to establish infringement. *Runge v. Lee*, 441 F.2d 579, 582 (9th Cir.

19

1971); *Williams v. Kaag Mfrs., Inc.*, 338 F.2d 949, 951 (1964). As the court stated in *Universal Pictures Co., Inc. v. Harold Lloyd Corp.*, 162 F.2d 354 (9th Cir. 1947): "[A]n infringement is not confined to literal and exact repetition or reproduction; it includes also the various modes in which the matter of any work may be adopted, imitated, transferred, or reproduced, with more or less colorable alterations to disguise the piracy." *Id*. at 360.

Moore set forth in his Opposition to Defendants' Motion for Summary Judgment a side-by-side comparison of the theme, characters, plot, sequence, pace and setting, showing the substantial similarities of *Aquatica*, *Pollination* and *Avatar*. *See* DE 152-1, pp. 22-31. The 62 detailed examples of similarities in theme, plot, characters, sequence, pace and setting were buttressed by the time sequenced sampling of similar conceptual expressions between *Avatar, Aquatica* and *Pollination* which, in 622 entries, showed the substantial similarities between Moore's and Cameron's scripts. JA 270-331; JA 45-115.

Finally, in an almost 200 page "Statement of Disputed Facts," Moore identifies over 450 factual disputations, stating the Defendants' "facts," and then providing a *per contra* evidentiary basis for the dispute as to each. JA 2752 – 2948. We sum up the factors briefly below starting with *Pollination* and *Avatar*.

20

a.    ***Pollination* and *Avatar***

**Extrinsic Analysis**

**Plot**. First, the majority of the movie *Avatar* and *Pollination* are set in mega forests with distinct natural features. These forests have trees that are so gargantuan that cities/villages live inside the trees, which reach into the sky. Defendants view these mega forests as *scenes a faire*, but they are not, because they contain a vast variety of elements unique to the two works, including: a battle for a world amid "gigantic" leaves and branches, bioluminescence covering trees and foliage, glowing seeds signifying that a hero/heroine is special, a godlike entity having power over the forest and potentially over all living things,  a wheelchair bound character seeking a new body, characters dying and joining a godlike entity which resides inside gargantuan tree(s). As well, there are multiple similar themes, battles, confrontations, transitions, and character development. Copyrighted works can be infringed without mirroring every plot element.

**Sequence of Events**. In both *Pollination* and *Avatar*, scenes begin with similar threats made by the female character to the male character's throat, and directly followed by the taking of the counter-protagonist to the other's community. These scenes are then followed by an introduction to the respective community's fifty-something-year-old matriarch and patriarch who accept the hero/heroine after a confrontation, and decide that the community's hero/heroine

21

will teach the new member/counter-protagonist, and leads to an engagement which centers on acceptance into the respective clans. These scenes are sequences of events. There are additional sequences in Moore's work which mirror those in the Defendants,' particularly in battle scenes. JA 45–93, ¶¶ 57, 60-62, 63-178, 208 and 251.

**Theme**. There are several themes similar to both *Pollination* and *Avatar*. Weaved throughout *Pollination* is the concept of the forest's healing; this is also a theme mimicked in *Avatar*. Defendants assert that *Pollination* has a pro-civilization theme and they contrast that with *Avatar's* theme of anti-colonialism. In so doing, the Defendants admit that *Avatar* and *Pollination* have substantially similar themes, that the two concepts could easily be attributed to either of the works. In *Pollination*, the Descendants' task is to stop the Pollinators from destroying their lands, which is quite similar to the position of the Na'vi in *Avatar*. Additionally, the story of *Avatar* from the Na'vi perspective is certainly one of pro-civilization; however, that is pro-Na'vi civilization and the further preservation of the Na'vi culture and values.

Notably, Jake's use of human technology (his genetically engineered avatar body, automatic weapons, communication links) is also pro-human civilization. Defendants must concede that the two works share a theme relating to a peoples' spiritual connections to the environment because "spiritual connections with

22

nature" is neither a truism as a matter of law, nor is it incidental to the idea of an epic science fiction action/adventure film. The themes found in *Pollination* are substantially similar to those appearing in *Avatar*.

**Setting**. The settings in *Pollination* are more than just images in the background, they became characters themselves, necessary in telling the story. The mega forests in Moore's work are substantially similar to those in *Avatar*. The natural habitats described in *Pollination* are distinct and unusual, set in lush, exotic forests with bioluminescence, vast foliage, giant limbs and leaves. There are cities alive inside the trees and on top of the trees, with some embellished by bioluminescent floating life forms. These unique settings are immediately identifiable within *Avatar*.

The antagonists' central headquarters in *Pollination* is also reflected in *Avatar* and presents a distinctly comparable setting. JA 50-51, ¶¶ 32, 42. In Plaintiff's script the surviving cities are essentially forest dwellings, similar to Hell's Gate headquarters and other dwellings portrayed in *Avatar*. Much like in *Avatar* where branches extend around treetop living space and gargantuan branches are part of the surroundings in these atypical cities, extending through the ground in the treetop cities, the distinct and unique nature of the settings in *Pollination* are not *scenes a faires*.

**Characters**. The substantial similarities between the characters in *Pollination* and *Avatar* are fundamental. JA 45-93, ¶¶ 1-11; 179-223. Both works conspicuously contain wheelchair-bound major characters seeking new bodies; unique and yet similar gender switches in the parallel scene; and likewise character role sequences with Gimil and Ninurta and then Jake and Neyteri engage the patriarchs and matriarchs. There is an additional similarity bolstered by the peculiar presence of arrow based ornaments around Mo'at and Ninurta's necks. The realization of the likeness, the substantial similarity between Neyteri and Ninurta is also found in Moore's copyrighted drawing of her. DE 157-42.

The major protagonist character parallels are sharply similar and persuasive: Jake to Gimil; Neyteri to Ninurta; Mo'at to Hadeana ("fifty-something" matriarchs with spiritual connections to nature and the ability to access power from the ancestors), and Eytukan to Hadean. JA 45-93, ¶¶ 180-196, 200, 218 (additional character comparisons).

Additionally, the similarities between Dr. Grace Augustine and the Microscopist cannot be overlooked. In *Pollination*, the latter studies samples, analyzes findings via microscope, and reveals that something major is happening biologically in the Mega Forest world. In *Avatar*, Dr. Grace Augustine studies samples, analyzes findings via microscope, and reveals that something major is happening biologically in the Na'vi forest world. Furthermore, Trudy closely

24

resembles Mittani as both are uniquely skilled to navigate the upper forest terrains. Side by side, or viewed in their entirety, the characters in Pollination, both major and supporting, are substantially similar, if not mirror images of those in *Avatar*.

**Dialogue.** The dialogue contained within *Pollination* and *Avatar* are substantially similar. Defendants will attempt to differentiate the dialogue contained within the two works, but Defendants cannot contend that such specific and similar dialogue references such as using both "spokes" and "trampolines" in the exact same manner is coincidental. Both works make startlingly similar dialogue references to an attack on "racial" versus "genetic" memory, a character's "brain activity," the protagonist being "lost" versus "playing" in the woods, the elders' distrust and eventually acceptance of an outsider into the native tribe, and that is only to name few specific examples among the many that Plaintiff compares throughout his various exhibits. JA 84-85, ¶¶ 236, 237, 238, 239.

**Mood.** The expression of affection Gimil shows for Ninurta is substantially similar to what Jake shows for Neyteri. *Pollination* reads: "We feel the wonderment as he presses his forearm against hers, causing their symbols to connect as if they are about to arm wrestle -- but arm wrestling is the most remote activity at this moment. He turns his hand until it is right in front of hers, then he grasps it with gentle subtlety." Gimil, "looking at her gently and intently" goes on to say "Ninurta, brace yourself. You are about to experience the power of genetic

25

memory. Soft light EXPLODES from their arms..." JA 68, ¶146. And as in *Avatar*, *Pollination* experiences death and "losses." In *Pollination* "Elish escaped with his life, but everyone on the other teams were killed." JA 1688.

There is also the mood of spirituality, ancestral connection and the battle between life and material things and life and God, which creates a comparable tone and mood in both works. Plaintiff's script refers to the Bio-Vapor having godlike powers enabling it to biologically impact life on the planet. That Bio-Vapor is distinctly comparable to Eywa. Notably, in his section entitled Road to *Avatar*, Defendants' expert Rovin states: "*Avatar* transforms the conventions of the scientific romance by drawing on the diverse genre elements of alien life forms, colonialism, ancestral memory, mind transfer, and the substantial pre-existing oeuvre of James Cameron, the creator of *Avatar*." JA 1346.

It should be noted that "ancestral memory" was not part of the purported *Avatar* scriptment whereas accessing the memories of the ancestors was a key part of *Pollination* which was registered with the US Copyright Office in 2003 – four years before the *Avatar* (2007) script was registered and four years after Lightstorm had access to Plaintiff Moore's *Pollination* screenplay. Indeed, while cosmic moods may be common the integration of an ancestral and spiritual connection is not, and both reflect particularized moods and substantial similarities between *Pollination* and *Avatar*.

26

**Pace.** The pace of *Avatar* and *Pollination* are substantially similar given that both scripts make little mention of time span. Upon comparing the sequencing and interplay in the respective scripts, it is evident that the actions rise and fall in a similar manner in both works.

## Intrinsic Analysis

In assessing intrinsic similarity, the fact finder looks to the "total concept and feel of the works, but only as seen through the eyes of the...intended audience of the plaintiff's work*." Lyons Partnership, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 801 (4th Cir. 2001). Given the breadth of the substantial similarities Plaintiff has discussed in reference to the first, extrinsic prong of the copyright protection test, a reasonable jury could find that the total concept and feel of both *Avatar* and *Pollination* are similar under the intrinsic test. Moore cited over two hundred and fifty substantial similarities and over 20 fragmented literal similarities between *Pollination*, *Aquatica* and *Avatar* (JA 3716-3721) that would likely cause a reasonable jury to find the works to be substantially similar under the intrinsic test.

27

b. _**Aquatica**_ **and** _**Avatar**_

**Extrinsic Analysis**

**Plot**. Contrary to arguments made to the trial court, _Aquatica_ is _not_ a story about a race to reach an ancient, lost city. In fact, Technopolis is never called a "city" or a "lost city." Rather, it is presented as "a science and research center" containing resources, which is located within a bioluminescent rainforest of gargantuan alien trees and plants. _Aquatica_, like _Avatar_, is about a hero who leaves a former life, joins a special soldiering outfit, and ends up engaging in conflict and battles in a forest of gargantuan alien trees, while also soldiering beside a select group of scientists/technologists lead by a brilliant female scientist. Like Jake in _Avatar_, Torin is tasked by the military leader to work with select scientists led by Dr. Octoria Hillia. Torin sees the horrific impact upon the local populations caused by RDA's world plundering warlordism and ultimately engages in battle against them. He teams up with Dr. Hillia and gives the various peoples new resolve to fight the plunderers. The battle scenes take place amidst comparable foliage, and mirror battle scenes in _Avatar_.

**Sequence of Events.** The detailed comparisons between _Aquatica_ and _Avatar_ were presented to the trial court in Plaintiff's Exhibit 2 to the Amended Complaint, JA 94-115. The detailed sequences of events in _Aquatica_ that are substantially similar to those in _Avatar_ included: Characters traversing a

28

bioluminescent rainforest of gigantic alien trees and view a three dimensional representation of the vegetation, kelp forests, a canyon, and rock surfaces; A genetically engineered, "long-leg" creatures floats inside a gigantic tank of water, while a protagonist looks on in amazement;  A character breaks through a wall of water;  The hero does a nose dive down the side of a gigantic natural structure; An attacker tails the hero as he weaves through gigantic plants, hanging plants.

*Avatar* shows the RDA soldier/scientists operation similarly armed with crafts, flex armor, weapons, and fighting individuals. In *Aquatica,* a scene involving the Tech Corp shows the following similar sequence: "THE DECK HATCH FLIES OPEN … Tech Corp crew climb out on to the deck. We see they are wearing flex body armor and brandishing guns and transparent combat shields… Both Gavadeens and Brodarians fight." JA 2977. Both Torin and Jake have their military backgrounds questioned by the lead scientists in light of the mission.

Similar sequences also take place in the rainforest of gargantuan trees, colossal alien foliage and leaves, massive cliff walls, plants growing upside down from rocks above the forest, and characters soaring between gargantuan branches.

**Theme**. *Avatar* and *Aquatica* share concrete themes, a thematic concern for the unending, fiendish pursuit of resources at the expense of life in an environment that is rife with enormous, bioluminescent flora and exotic fauna. The works both

29

share a similar theme of world plundering warlords and misuse of advanced military power for the purposes of obtaining resources and land. Additionally, the similar theme of genetically engineered creatures that are sent out on missions and fight (for example Jake's Avatar body and Nardus' long-legged genetically engineered creatures), are prominent and substantial.

**Pace.** The pace of *Avatar* and *Aquatica* are also substantially similar. The *Avatar* script makes little mention of time span, nor does *Aquatica;* however, upon comparing the sequencing in the respective scripts, it is evident that the actions rise and fall in a similar manner in both works. It is anticipated that the Defendants' will rebut this assertion by arbitrarily assigning a time span to *Avatar* without regard to what is described within the script. In *Kelly Van v. James Cameron*, 10-cv-01051-AJB-WVG, Southern District of California (2011), Defendants asserted that *Avatar* took place "over the course of a few months" (DE 26-1, p.5), and they cannot be allowed now to redefine the pace of the *Avatar* script depending on the pace of their opponent's protected work. Such an argument would be disingenuous and lend credence to Moore's argument that there are, at the least, disputed issues of fact with regard to this important extrinsic factors.

**Setting.** Both *Aquatica* and *Avatar* have gargantuan, alien trees that are so large that they dwarf crafts; plants growing upside down from rocks; a bioluminescent rainforest of gargantuan, alien trees; strange, spherical, and oval

floating objects that cause the crew to look on in awe; gargantuan leaves; gargantuan tree limbs, branches, and vines that wrap around gargantuan natural structures; plant pillars and plant columns; colossal, arched rock structures; huge, waving, bioluminescent plants; where an enormous rock cavity contains forest of gargantuan trees and where web-like plants grow on bottom of the rock cavity. *Aquatica* settings also include three-dimensional graphics of jungle, vegetation, and a canyon. JA 96-103, ¶¶ 12-60.

Additionally, in *Aquatica,* Gavadeen City is a distinctive complex of buildings which has a counterpart in *Avatar's* Hell's Gate. Like Atrea Island and Brodarian City in *Aquatica,* Hell's Gate is also depicted as having an expansive security watch center. Furthermore, the rock cavity in *Aquatica* is substantially similar to the Well of Souls in *Avatar*.  JA 96, ¶ 14.

**Mood.** The moods exhibited throughout both *Avatar* and *Aquatica* are substantially similar. For example, in both works, the lead female scientists exhibit an initial distrust of the hero's military background in light of the science based mission.  The emotive distrust Dr. Octoria Hillia feels for Torin Gato in *Aquatica* is subtle, carefully crafted and palpable throughout the script. This element of distrust is specific and unique and evolves into a mutual understanding and supportive relationship. And yet their unique circumstances is mimicked in the interactions between Dr. Grace Augustine and Jake Sully of *Avatar*.

31

The grandeur of the bioluminescent rainforest evokes feelings of anticipation and cautious optimism as the characters traverse through the gigantic alien trees and plants. This awe-inspiring bioluminescent rainforest itself sets a tone in the work. Additionally, a similar cloud of loss looms over the stories after the demise of Octoria's and Neytiri's fathers. JA 94-115, ¶¶ 6, 124-134. As such, the moods contained within both *Avatar* and *Aquatica* are substantially similar.

**Character.** *Aquatica* and *Avatar* each contain specific characterizations that are substantially similar. Both Sully and Gato left their respective soldering squads to join special outfits, to work alongside a select group of scientists and technologists created to study a resource-rich area that is covered with giant, bioluminescent flora. Sully and Gato's backgrounds are substantially similar and startlingly specific expressions, and as such, should be afforded copyright protection. JA 94-115, ¶¶ 1, 34, 50, 72, 73, 77, 78.

Further evidence of substantial similarities between the characterizations in both works is the mirrored female lead scientist characters, who display specific distrusts toward the hero's military background in light of the mission. *Id.* ¶106. Both works have a scene in which the protagonist and the lead female scientist look at a computer display of an attacker which hunts and tails its prey at the lead scientists "workstation." JA 106, ¶ 76. Grace and Hillia are essentially exact replications of one another. *Id.* and JA 113, ¶ 119.

32

Toruk Macto and Chancellor Orkham are also substantially similar in that their only real role within the works is in reference to their uniting of their respective native clans against the threat of invasion. JA 112-113, ¶ 112. Additionally, the other mentioned characters are quite similar and such similarities are referenced in detail in the Record, JA 94-115.

**Dialogue.** Defendants will try to ignore substantially similar dialogue references and attempt to differentiate the dialogue contained within the two works by citing lesser phrases found within Plaintiff's protected work. Defendants will cite to *Narell v. Freeman,* 872 F.2d 907, 911 (9th Cir. 1989)*,* in stating that "[o]rdinary phrases are not entitled to copyright protection." But unordinary portions of dialogue, e.g., a protagonist addressing a large group of native people of the "Eastern Sea" along the shoreline, are protected phrases. JA 94-115, ¶¶ 1, 106-123.

<u>**Intrinsic Analysis**</u>

Under the second prong of the substantial similarity analysis, "the intrinsic inquiry. . . implicates the perspective of the object's intended observer." *Dawson v. Hinshaw Music, Inc*., 905 F.2d 731, 733 (4th Cir. 1990); *see also* 17 U.S.C.A. §§ 101, 102(a)(5). Judge Learned Hand phrased the intrinsic test as whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Peter Pan Fabrics,*

*Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960). The argument sections above refers to a vast body of comprehensive substantial similarities that would lead a reasonable jury to find that the total concept and feel of both *Avatar* and *Aquatica* are similar under the intrinsic test.

Given the specific details identified in the individual works, the voluminous factual similarities and the genuine issues of disputed facts presented to the trial court, the grant of summary judgment was not proper.

## II.

## <u>THE ERRORS BELOW</u>

Although this Court's review is *de novo* and without deference to the decision below, it is fair to point out some of the areas in which the court below erred.

As to access, the decision below failed to give full throat to the legal threshold that needs to be met: the "opportunity to view or to copy plaintiff's work (*Marty Kroft*, 562 F.2d at 1163)," and the "reasonable possibility" that a defendant had access to plaintiff's work. *Meta Film Assoc. v. MCA, Inc.*, 586 F.Supp 1346, 1355 (D.C.Cal. 1984). The court's dismissive treatment of the corporate receipt doctrine, and the facts supporting it (JA 4515 - 4517), and its effort to distinguish this case from *Bouchat v. Baltimore Ravens, Inc*., 228 F.3d 489 (4th Cir. 2000),

reflect a search for reasons to grant summary judgment, not a search for whether, at the least, there were disputed facts precluding summary judgment.

An example is the court's footnote dismissing as "immaterial" the fact that the Lightstorm reviews of Moore's screenplays on Lightstorm's database (not "online") showed both a 2003 and a 2004 update. The court played down the significance by crediting "Defendants' claim that a computer system update" was responsible for the 2004 review. JA 4523, n. 4. That is one small example of the summary judgment "favorable to the opposing party" standard being disregarded. It is for a jury to decide the credibility of the Defendants' explanation.

As to substantial similarities, the court erred by focusing first on the film, not the scripts, and then focused on selected dissimilarities and unprotectable elements, overlooking the evidence of the protectable elements which were detailed in Plaintiff's Statement of Disputed Facts. JA 2752-2948. The court concedes (as it must) that "the two works share certain limited commonalities" (JA 4529), but then writes them off as "*scenes a faire*" (JA 4528), which he would not count in the calculus for copyright infringement. That search for *scenes a faire* and other ways to foil the Plaintiff's claim, was incompatible with summary judgment, incompatible with a correct understanding and application of *scenes a faire*, and, most importantly, played down or overlooked the extensive submission of disputed facts relating to plot, setting, characters, dialogue, mood and pace.

35

## CONCLUSION

This was not a case to be decided on summary judgment. The decision below should be reversed and remanded for trial.

## REQUEST FOR ORAL ARGUMENT

Oral argument would assist the Court in this case. The legal standards governing a copyright infringement claim are not easily applied. Indeed there is a split among the circuits regarding the appropriate tests to be utilized in determining whether a plaintiff's work was "copied" within the meaning of copyright law. In this case, the determination must be made *de novo*, and oral argument would provide the Court with help in its review and comparison of *Aquatica*, *Pollination* and *Avatar*. The record is lengthy and contains both written and visual materials. The guiding voices of the parties at oral argument would be beneficial.

Respectfully submitted,

July 9, 2014

*/s/Bruce S. Rogow*

BRADLEY ASHTON THOMAS
Unified Bar No. 362656
**THE LAW OFFICE OF**
**BRADLEY A. THOMAS**
1629 K Street, N.W., Suite 300
Washington, DC 20006-1631
(202) 289-7574
batlaw@bradleythomaslaw.com

BRUCE S. ROGOW
Fla. Bar No. 067999
TARA A. CAMPION
Fla. Bar No. 090944
**BRUCE S. ROGOW, P.A.**
500 E Broward Blvd. Ste 1930
Fort Lauderdale, Florida 33394
(954) 767-8909
brogow@rogowlaw.com
tcampion@rogowlaw.com

36

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.     This brief complies with the type-volume limitation of Fed.R.App.P.32(a)(7)(B) because this brief contains <u>7,866 </u> words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)B)(iii).

2.     This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.


<u>*/s/ Bruce S. Rogow*</u>
BRUCE S. ROGOW

## CERTIFICATE OF SERVICE

In accordance with Rule 25 of the Rules of the United States Court of Appeals for the Fourth Circuit, I hereby certify that I have this July 9, 2014, filed the required copies of the foregoing Brief of Appellant in the Office of the Clerk of the Court, via hand delivery and have electronically filed the Brief of Appellant using the Court's CM/ECF system which will send notification of such filing to the following counsel:

Robert H. Rotstein
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA 90064
Email: rxr@msk.com

J. Matthew Williams
MITCHELL SILBERBERG & KNUPP LLP
8th Floor
1818 N Street, NW
Washington, DC 20036
Email: mxw@msk.com

*/s/ Bruce S. Rogow*
BRUCE S. ROGOW