No. 14-1135

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

BRYANT MOORE,
*Plaintiff – Appellant*,

v.

LIGHTSTORM ENTERTAINMENT, INC.; JAMES CAMERON; AND
TWENTIETH CENTURY FOX FILM CORPORATION,
*Defendants – Appellees*.

---

Appeal From The United States District Court
For The District of Maryland
Case No. CV 11-03644
(Honorable Roger W. Titus, Presiding)

---

**RESPONSE BRIEF OF APPELLEES AND DEFENDANTS LIGHTSTORM
ENTERTAINMENT, INC., JAMES CAMERON AND TWENTIETH
CENTURY FOX FILM CORPORATION**

---

MITCHELL SILBERBERG & KNUPP LLP

ROBERT H. ROTSTEIN
11377 West Olympic Boulevard
Los Angeles, California 90064-1683
Email: rxr@msk.com
Telephone: (310) 312-2000

J. MATTHEW WILLIAMS
1818 N Street, NW, 8th Floor
Washington, DC 20004
Email: mxw@msk.com
Telephone: (202) 355-7900

*Attorneys for Defendants and Appellees Lightstorm Entertainment, Inc., James
Cameron, and Twentieth Century Fox Film Corporation*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1 and Local Rule 26.1:

1.      Defendant and Appellee Lightstorm Entertainment, Inc. is not a publicly traded corporation and no publicly held corporation owns 10% or more of its stock.

2.      Defendant and Appellee James Cameron is an individual.

3.      Defendant and Appellee Twentieth Century Fox Film Corporation is not a publicly traded corporation.  However, it is a wholly owned subsidiary of Fox Entertainment Group, Inc.  Twenty-First Century Fox, Inc., which is a publicly traded company, owns 10% or more of the stock in Fox Entertainment Group, Inc.

4.      Lexington Insurance Co., which is owned by American International Group, Inc. (AIG), may have an interest in the outcome of this litigation.


DATED:  September 10, 2014         ROBERT H. ROTSTEIN
                                   J. MATTHEW WILLIAMS
                                   MITCHELL SILBERBERG & KNUPP
                                   LLP


                                   By:    s/ Robert H. Rotstein
                                          Robert H. Rotstein
                                          *Attorneys for Defendants/Appellees*

i

# TABLE OF CONTENTS

**Page**

COUNTERSTATEMENT OF ISSUES ................................................................ 1

STATEMENT OF CASE AND SUMMARY OF ARGUMENT ........................... 2

STATEMENT OF FACTS .............................................................................. 4
    I.    *AVATAR* ................................................................................. 4
        A.    Cameron's Creation Of *Avatar* ...........................................4
        B.    Summary Of *Avatar* ............................................................7
    II.    PLAINTIFF'S *POLLINATION* AND *AQUATICA* ........................... 10
        A.    Plaintiff Bryant Moore .........................................................10
        B.    Summary Of *Aquatica* .......................................................10
        C.    Summary Of *Pollination* ....................................................12
        D.    Plaintiff's Access Claims .....................................................14
            1.    1994 Transmittal Of *Aquatica* To Gibson ................... 14
            2.    2003 Submissions ...................................................... 15

STANDARD OF REVIEW ........................................................................... 16

ARGUMENT ............................................................................................ 17
    III.    IT WAS UNCONTROVERTED THAT DEFENDANTS INDEPENDENTLY CREATED *AVATAR*; PLAINTIFF HAS NOT CHALLENGED THAT RULING ON APPEAL. .................... 19
    IV.    DEFENDANTS HAD NO ACCESS TO PLAINTIFF'S SCREENPLAYS. ............................................................... 21
        A.    Defendants Did Not Have Access To *Aquatica* Through Gibson. .............................................................................22
        B.    Plaintiff's 2003 Submissions Cannot Establish Access Because Cameron Completed The *Avatar* Scriptment Seven Years Earlier. ..........................................................23
        C.    Even In The Absence Of The Scriptment, Plaintiff's 2003 Submissions Could Not Establish Access Because *Avatar*'s Creators Never Had A Reasonable Opportunity To View Plaintiff's Screenplays. ....................................................25
    V.    *AVATAR* IS NOT SUBSTANTIALLY SIMILAR TO PLAINTIFF'S SCREENPLAYS. ................................................ 27
        A.    *Avatar* Is Not Substantially Similar To Plaintiff's Works Under The Extrinsic Test. ......................................................29
            1.    *Avatar* Is Not Substantially Similar To *Pollination*. ..... 32

# TABLE OF CONTENTS
## (continued)

2.  *Avatar* Is Not Substantially Similar To *Aquatica* .......... 47

B.  *Avatar* Is Not Substantially Similar To Plaintiff's Works Under The Intrinsic Test. .........................................................54

C.  There Are No Fragmented Literal Similarities Between *Avatar* And Plaintiff's Works. ..................................................57

D.  Plaintiff's Lists of Random Similarities Cannot Establish Substantial Similarity. ................................................................58

CONCLUSION ............................................................................................... 59

CERTIFICATE OF COMPLIANCE .................................................................... 60

CERTIFICATE OF SERVICE ............................................................................. 61

6373280.1/42040-00008

# TABLE OF AUTHORITIES

**Pages**

## CASES

*Arden v. Columbia Pictures Indus., Inc.*,
    908 F. Supp. 1248 (S.D.N.Y 1995) ...................................................56

*Armour v. Knowles*,
    512 F.3d 147 (5th Cir. 2007) ....................................................18, 24

*Arnstein v. Porter*,
    154 F.2d 464 (2d Cir. 1946) ...........................................................28

*Baby Buddies, Inc. v. Toys R Us, Inc.*,
    611 F.3d 1308 (11th Cir. 2010) ......................................................59

*Beal v. Paramount Pictures Corp.*,
    20 F.3d 454 (11th Cir. 1994) ..........................................................34

*Beale v. Hardy*,
    769 F.2d 213 (4th Cir. 1985) ..........................................................23

*Benay v. Warner Bros. Entm't, Inc.*,
    607 F.3d 620 (9th Cir. 2010) ..........................................................18

*Benjamin v. Walt Disney Co.*,
    No. CV05-2280GPS, 2007 U.S. Dist. LEXIS 91710
     (C.D. Cal. June 5, 2007) ...............................................................31

*Berkic v. Crichton*,
    761 F.2d 1289 (9th Cir. 1985) ...................................................32, 34

*Bernal v. Paradigm Talent & Literary Agency*,
    788 F. Supp. 2d 1043 (C.D. Cal. 2010) ..........................................23

*Beverati v. Smith*,
    120 F.3d 500 (4th Cir. 1997) ..........................................................16

*Bissoon-Dath v. Sony Comp. Entm't Am., Inc.*,
    694 F. Supp. 2d 1071 (N.D. Cal. 2010),
    *aff'd and adopted without opinion by*,
    653 F.3d 898 (9th Cir. 2011) ...............................................18, 30, 39

iv

## TABLE OF AUTHORITIES
### (continued)

**Pages**

*Bldg. Graphics, Inc. v. Lennar Corp.*,
708 F.3d 573 (4th Cir. 2013) ...............................................................17, 21, 23

*Blehm v. Jacobs*,
702 F.3d 1193 (10th Cir. 2012) .........................................................18

*Bouchat v. Baltimore Ravens, Inc.*,
228 F.3d 489 (4th Cir. 2000) ..............................................................26

*Bouchat v. Baltimore Ravens, Inc.*,
241 F.3d 350 (4th Cir. 2001) ..............................................................21

*Campbell v. The Walt Disney Co.*,
718 F. Supp. 2d 1108 (N.D. Cal. 2010)............................................46

*Capital Produce Co. v. United States*,
930 F.2d 1077 (4th Cir. 1991) ...........................................................29

*Christian v. Mattel, Inc.*,
286 F.3d 1118 (9th Cir. 2002) ...........................................................18

*Clay v. Cameron*,
No. 10-22203-CIV-JORDAN (S.D. Fla. Oct. 20, 2011),
*aff'd,* No. 12-14097 (11th Cir. Oct. 16, 2012)....................................2

*Comins v. Discovery Communications, Inc.*,
200 F. Supp. 2d 512 (D. Md. 2002).................................17, 21, 28, 59

*Dawson v. Hinshaw Music Inc.*,
905 F.2d 731 (4th Cir. 1990) ..............................................................27

*Eaton v. Nat'l Broad. Co.*,
972 F. Supp. 1019 (E.D. Va. 1997),
*aff'd*, 145 F.3d 1324 (4th Cir. 1998)................. 18, 22, 27, 28, 30, 34, 41, 56, 59

*Eriline Co. S.A. v. Johnson*,
440 F.3d 648 (4th Cir. 2006) ..............................................................19

*Evans v. Wallace Berrie & Co., Inc.*,
681 F. Supp. 813 (S.D. Fla. 1988)......................................................30

## TABLE OF AUTHORITIES
### (continued)

**Pages**

*Feist Publ'ns Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991) ........................................................................17

*Ferguson v. Nat'l Broad. Co., Inc.*,
    584 F.2d 111 (5th Cir. 1978) ....................................................23, 28

*Funky Films, Inc. v. Time Warner Entm't Co.*,
    462 F.3d 1072 (9th Cir. 2006) ....................................18, 29, 37, 42

*Gable v. Nat'l Broad. Co.*,
    727 F. Supp. 2d 815 (C.D. Cal. 2010),
    *aff'd*, 438 Fed. Appx. 587 (9th Cir. 2011) ..................................18, 23

*Goldberg v. Cameron*,
    787 F. Supp. 2d 1013 (N.D. Cal. 2011) ...........................................29

*Grubb v. KMS Patriots, L.P.*,
    88 F.3d 1 (1st Cir. 1996) ..................................................................24

*Harney v. Sony Pictures Television, Inc.*,
    704 F.3d 173 (1st Cir. 2013) ............................................................18

*Herzog v. Castle Rock Entm't*,
    193 F.3d 1241 (11th Cir. 1999) ..........................................18, 43, 59

*Hoehling v. Universal City Studios, Inc.*,
    618 F. 2d 972 (2d Cir. 1980) ...........................................................28

*Johnson v. Gordon*,
    409 F.3d 12 (1st Cir. 2005) ..............................................................53

*Jones v. Blige*,
    558 F.3d 485 (6th Cir. 2009) ...........................................................25

*Jones v. CBS, Inc.*,
    733 F. Supp. 748 (S.D.N.Y. 1990) ...................................................51

*Kouf v. Walt Disney Pictures & Television*,
    16 F.3d 1042 (9th Cir. 1994) ...........................................................59

vi

# TABLE OF AUTHORITIES
## (continued)

**Pages**

*Litchfield v. Spielberg*,
736 F.2d 1352 (9th Cir. 1984) ........................................27, 34, 55, 59

*Lyons P'ship, L.P. v. Morris Costumes, Inc.*,
243 F.3d 789 (4th Cir. 2001) ...............................................27, 28, 55

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
674 F.3d 369 (4th Cir. 2012) ...............................................................19

*McRae v. Smith*,
968 F. Supp. 559 (D. Colo. 1997).......................................................29

*Meta-Film Associates, Inc. v. MCA, Inc.*,
586 F. Supp. 1346 (C.D. Cal. 1984) ..................................................23

*Metcalf v. Bochco*,
294 F.3d 1069 (9th Cir. 2002) ............................................................58

*Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*,
702 F.3d 1312 (11th Cir. 2012) ..........................................................18

*Moore v. Columbia Pictures Indus., Inc.*,
972 F.2d 939 (8th Cir. 1999) ..............................................................26

*Morawski v. Lightstorm Entm't, Inc.*,
No. CV-11-10294 MMM (JCGx) (C.D. Cal. Jan. 31, 2013) ........................2, 20

*Muller v. Twentieth Century Fox Film Corp.*,
794 F. Supp. 2d 429 (S.D.N.Y. 2011),
*aff'd*, 501 Fed. Appx. 81 (2d Cir. 2012) ....................................18, 28, 32, 43, 50

*Murray Hill Publ'ns, Inc. v. ABC Comm., Inc.*,
264 F.3d 622 (6th Cir. 2001) ..............................................................57

*Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film Corp.*,
361 F.3d 312 (6th Cir. 2004) .......................................................30, 31

*Narell v. Freeman*,
872 F.2d 907 (9th Cir. 1989) ..............................................................44

vii

# TABLE OF AUTHORITIES
## (continued)

**Pages**

*Nat'l Med. Care, Inc. v. Espiritu*,
284 F. Supp. 2d 424 (S.D. W. Va. 2003)..........................................................21

*Nelson v. Grisham*,
942 F. Supp. 649 (D.D.C. 1996),
*aff'd*, 132 F.3d 1481 (D.C. Cir. 1997) (*per curiam*).....................................48, 56

*Newton v. Diamond*,
388 F.3d 1189 (9th Cir. 2003) ..........................................................................57

*Olson v. Nat'l Broad. Co.*,
855 F.2d 1446 (9th Cir. 1988) ..........................................................................44

*Peter Letterese & Assoc. v. World Inst. of Scientology Enters.*,
533 F.3d 1287 (11th Cir. 2008) ........................................................................57

*Rice v. Fox Broad. Co.*,
330 F.3d 1170 (9th Cir. 2003) ..........................................................................54

*Rokeach v. Avco Embassy Pictures Corp.*,
No. 75-Civ.-49(CHT), 1978 U.S. Dist. LEXIS 20101
(S.D.N.Y. Jan. 17, 1978)...................................................................................57

*Rossignol v. Voorhaar*,
316 F.3d 516 (4th Cir. 2003) ..............................................................................3

*Ryder v. Lightstorm Entm't Inc.*,
No. BC-474876 (Cal. Super. Ct. Jan. 7, 2014)..............................................2, 20

*Satava v. Lowry*,
323 F.3d 805 (9th Cir. 2003) ............................................................................58

*Schkeiban v. Cameron*,
No. CV-12-0636-R MANX (C.D. Cal. Oct. 4, 2012),
*aff'd*, No. 12-56964 (9th Cir. Apr. 1, 2014) ......................................................2

*Scott v. Paramount Pictures Corp.*,
449 F. Supp. 518 (D.D.C. 1978)........................................................................28

*Scott-Blanton v. Universal City Studios Prod., LLLP*,
539 F. Supp. 2d 191 (D.D.C. 2008)...................................................................56

viii

## TABLE OF AUTHORITIES
### (continued)

**Pages**

*Sherman v. Jones*,
    457 F. Supp. 2d 793 (E.D. Mich. 2006) .............................................................59

*Smith v. Weinstein*,
    578 F. Supp. 1297 (S.D.N.Y. 1984) ...................................................................52

*Sportsmans Warehouse, Inc. v. Fair*,
    576 F. Supp. 2d 1175 (D. Colo. 2008)..............................................................31

*Stromback v. New Line Cinema*,
    384 F.3d 283 (6th Cir. 2004) ..............................................................18, 53, 59

*Sylvia Dev. Corp. v. Calvert Cnty., Md.*,
    48 F.3d 810 (4th Cir. 1995) .........................................................................16, 17

*Tessler v. NBC Universal, Inc.*,
    No. 2:08cv234, 2008 U.S. Dist. LEXIS 108353
    (E.D. Va. Dec. 5, 2008), *adopted in relevant part by,*
    2009 U.S. Dist. LEXIS 27345
    (E.D. Va. Mar. 31, 2009), *aff'd,*
    364 Fed. Appx. 5 (4th Cir. Feb. 4, 2010)..........................................................38

*Towler v. Sayles*,
    76 F.3d 579 (4th Cir. 1996) .................................................... 22, 25, 26, 29, 55, 58

*U.S. v. Aparicio-Soria*,
    740 F.3d 152 (4th Cir. 2014) ..............................................................................29

*Universal Furniture v. Collezione Europa USA*,
    618 F.3d 417 (4th Cir. 2010) ..............................................................................55

*Van v. Cameron*,
    No. 10cv1051 AJB (WVG) (S.D. Cal. Sept. 26, 2011),
    *aff'd,* No. 12-55416 (9th Cir. Apr. 1, 2014) ...............................................2, 38

*Vantage Point, Inc. v. Parker Bros., Inc.*,
    529 F. Supp. 1204 (E.D.N.Y. 1981) .................................................................26

*Walker v. Time Life Films, Inc.*,
    784 F.2d 44 (2d Cir. 1986) .................................................................................48

6373280.1/42040-00008

# TABLE OF AUTHORITIES
## (continued)

**Pages**

*Warner Bros. v. Am. Broad. Cos.*,
  720 F. 2d 231 (2d Cir. 1983) ....................................................28, 56

*Watkins v. Chesapeake Custom Homes, L.L.C.*,
  330 F. Supp. 2d 563 (D. Md. 2004)............................................19, 20

*Whitehead v. Paramount Pictures Corp.*
  53 F. Supp. 2d at 48-50 (1999) .........................................................56

*Wild v. NBC Universal, Inc.*,
  788 F. Supp. 2d 1083 (C.D. Cal. 2011),
  *aff'd,* 513 F. Appx. 640 (9th Cir. 2013)...........................................38

*Williams v. Crichton*,
  84 F.3d 581 (2d Cir. 1996) .................................. 18, 28, 30, 34, 52, 59

## OTHER AUTHORITIES

AM. HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE
  (3d ed. 1992) .......................................................................................54

Federal Rules of Evidence
  Rule 403 ..............................................................................................58

Federal Rules of Appellate Procedure
  Rule 28(a)(9)(A) ................................................................................19
  Rule 32(a)(7)(C)..................................................................................61

# TABLE OF ABBREVIATIONS

Defendants/Appellees use the following abbreviations:

1.      "Att(s)" refers to exhibits contained in the Joint Appendix that were manually filed, such as commercially available DVDs of motion pictures.  These exhibits are contained in Volume XIII of the Joint Appendix.

2.      "ECF" refers to district court docket entries for documents that are not contained in the Joint Appendix.

3.      "JA" refers to pages in the Joint Appendix.

4.      "OB" refers to pages in Plaintiff's/Appellant's Opening Brief on appeal.

## COUNTERSTATEMENT OF ISSUES

1.      Because Plaintiff/Appellant nowhere on appeal challenges that portion of the district court's order granting summary judgment on the ground that Defendants independently created the motion picture *Avatar*, should this Court affirm in light of Plaintiff/Appellant's waiver of his right to contest independent creation?

2.      Should the Court affirm the district court's order for the separate reason that Plaintiff failed to rebut the undisputed evidence that Defendants independently created *Avatar*?

3.      Should the Court affirm the district court's summary judgment order for the separate reason that Plaintiff failed to raise a genuine dispute of material fact as to whether Defendants lacked access to Plaintiff's allegedly infringed screenplays?

4.      Should the Court affirm the district court's summary judgment order for the separate reason that *Avatar* is not substantially similar in protected expression to either of Plaintiff's allegedly infringed screenplays?

1

## STATEMENT OF CASE AND SUMMARY OF ARGUMENT

Successful Hollywood movies seem to generate frivolous infringement lawsuits from people who had nothing to do with the films. That describes this lawsuit, one of a number where different plaintiffs claim that they, not renowned director, producer, and screenwriter James Cameron ("Cameron"), created the motion picture *Avatar*.[1] The district court properly granted summary judgment for Defendants.

A plaintiff in a copyright infringement action must prove that (i) the defendant had access to the plaintiff's work (*i.e.*, a reasonable opportunity to view it before the defendant created the allegedly infringing work); **and** (ii) the works at issue are substantially similar in protectable expression. Moreover, even where access and substantial similarity exist, summary judgment is nonetheless appropriate where it is uncontroverted that the defendant's work was independently created. The district court held that as a matter of law Cameron independently created *Avatar*; that Plaintiff/Appellant Bryant Moore failed to raise

---

[1] *See Morawski v. Lightstorm Entm't, Inc.*, No. CV-11-10294 MMM (JCGx) (C.D. Cal. Jan. 31, 2013); *Ryder v. Lightstorm Entm't Inc.*, No. BC-474876 (Cal. Super. Ct. Jan. 7, 2014); *Schkeiban v. Cameron*, No. CV-12-0636-R MANX (C.D. Cal. Oct. 4, 2012), *aff'd,* No. 12-56964 (9th Cir. Apr. 1, 2014); *Van v. Cameron*, No. 10cv1051 AJB (WVG) (S.D. Cal. Sept. 26, 2011), *aff'd,* No. 12-55416 (9th Cir. Apr. 1, 2014); *Clay v. Cameron*, No. 10-22203-CIV-JORDAN (S.D. Fla. Oct. 20, 2011), *aff'd,* No. 12-14097 (11th Cir. Oct. 16, 2012). The Addendum contains these unpublished opinions.

2

a genuine dispute regarding Defendants' access to his unpublished screenplays;
and that as a matter of law Plaintiff's screenplays and *Avatar* are not substantially
similar in protected expression.

The Court should affirm. Plaintiff did not appeal the ruling regarding
independent creation; his waiver of this dispositive issue alone mandates
affirmance. In any event, the district court properly held that Defendant failed to
raise a genuine dispute regarding access, substantial similarity, or independent
creation.[2]

---

[2] The parties filed cross-motions for summary judgment. Defendants' motion was
granted and Plaintiff's was denied. Nevertheless, Plaintiff bases the factual
discussion in his Opening Brief on "Defendants' Response to 'Plaintiff's Genuine
Statement of Material Facts To Which There Are No Dispute'" (ECF:166-1),
which Defendants filed below with their Opposition to **Plaintiff's unsuccessful**
Partial Motion for Summary Judgment (ECF:150). Not only has Plaintiff failed to
appeal the denial of his Partial Motion, but nothing contained in Defendants'
Response thereto raised any genuine dispute of fact precluding the district court
from granting Defendants' separate summary judgment motion. *See Rossignol v.
Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) ("When faced with cross motions for
summary judgment, the court must review each motion separately on its own
merits to determine whether either of the parties deserves judgment as a matter of
law."). Despite requests from Defendants to include their Response to Plaintiff's
Partial Motion in the Joint Appendix, Plaintiff did not comply. Although the
Partial Motion is irrelevant to this appeal, for the sake of a complete record,
Defendants have filed an unopposed Motion to supplement the Appendix.

## STATEMENT OF FACTS

### I. *AVATAR*

#### A. <u>Cameron's Creation Of *Avatar*</u>

*Avatar* is an award-winning science-fiction film written and directed by Cameron.[3]  JA:400-01.  Defendant Lightstorm Entertainment, Inc. ("Lightstorm") is Cameron's production company.  JA:400.  Defendant Twentieth Century Fox Film Corporation ("Fox") distributed *Avatar*.

Set in 2148, *Avatar* is the story of a paraplegic ex-marine, Jake Sully, who travels to Pandora, the lush moon of a distant planet, to operate a genetically engineered "avatar" that enables him to interact with the native inhabitants.  Jake, in his avatar body, falls in love with Neytiri, a beautiful female native, and embraces her people (the Na'vi), their culture, and Pandora's exotic environment.  Ultimately, Jake challenges the humans who seek to exploit valuable minerals on Pandora and leads the Na'vi in a heroic battle to save the native civilization and the moon itself.  In the process, his human body dies, and he survives in his avatar state.  JA:1212-13, 1321, Att:111.

---

[3] Cameron has received numerous awards for his films, including the Academy Awards for Best Director and Best Picture for *Titanic*.  JA:400.  He has also made documentaries about deep-ocean exploration.  JA:401, Atts:114, 116.

*Avatar* flowed out of Cameron's lifelong fascination with science, nature, the environment, science fiction, history, and philosophy. JA:404-06, 1062-63. The film contains ideas, themes, characters, settings, and images present both in Cameron's decades-old artwork and unpublished scripts and in his widely released films, including *The Terminator* (1984), *Rambo: First Blood Part II* (1985), *Aliens* (1986), *The Abyss* (1989), *Terminator 2: Judgment Day* (1991), *Strange Days* (1995) and *Titanic* (1997). JA:404-05, 408-32, 509-757, 1237, 1263, 1284, 1363-71, 1507, 2418-34, Atts:112-13, 120-27.

Cameron derived *Avatar*'s exotic settings from his work in the late-1970s on *Xenogenesis*, an unproduced film project. JA:410-13. *Xenogenesis* included a planet with gigantic trees and bioluminescent plants very similar to those in *Avatar*. JA:405, 408-09, 410-13, 510-11, 534, 861-75, 1062-63, 4589, 4635, Att:22. *Avatar*'s glowing settings are also reminiscent of Cameron's 1989 film *The Abyss*, in which bioluminescent aliens are discovered living deep at the bottom of an underwater canyon that glows in a spectacular shade of purple. JA:413, 1345, 1370, 2422-24, Att:112.

*Avatar*'s main characters share significant similarities with characters from Cameron's earlier works. As noted, *Avatar*'s protagonist Jake is a wheelchair bound paraplegic who experiences walking again when operating an avatar body. JA:417-18. In Cameron's script for the 1995 film *Strange Days*, a wheelchair

5

bound character uses a device that plays discs containing other people's recorded sensory experiences to feel what it is like to run.  JA:418, 429, 693, Att:123. Additionally, Jake, a military veteran, embarks on a mission only to realize that he is more comfortable in the jungles of Pandora than he is working for his corporate employers.  JA:1383.  Similarly, in Cameron's 1985 screenplay for *Rambo: First Blood Part II*, the protagonist is a former Army special-forces soldier who travels back to the jungles of Viet Nam to rescue POWs only to realize that his boss has rigged the mission against him.  JA:418-19, Att:121.  In the process, Rambo, like Jake, falls in love with an indigenous woman.  JA:418-19, 1365-66.

While the film *Avatar* was not released until 2009, no later than March 1996 Cameron completed and began circulating a detailed script-length treatment that tells the entire *Avatar* story (the "Scriptment"), complete with descriptions of the settings, visuals, and verbal exchanges between the characters.  JA:402, 433-503, 759, 764-859, 916-1060, 1075-1194, 1214-15, 1237, 1245, 1252, 1364, 1373-74, 1382, 1402-04, 1409, 1412, 1433-1435, 1439.  Virtually all elements of *Avatar* that Plaintiff claims are similar to his works are in the Scriptment.[4]  JA:45-115, 433-498, 1435, 2530-35, Att:111.

---

[4] The differences between the Scriptment and the 2009 film are immaterial to this case.  For example, several character names from the Scriptment were changed for the film, and a few supporting characters from the Scriptment were combined or eliminated in the film.  JA:1215, 1259-60.  Naturally, there is more dialogue in the film than in the Scriptment.

6

After suspending work on the project for a decade so technology could catch up to his vision for *Avatar*, Cameron turned the Scriptment into a screenplay between 2005 and 2007. JA:402-03, 1064-65, 1075-76. Principal photography on *Avatar* began in April 2007. JA:402. *Avatar* premiered in London on December 10, 2009, becoming the highest-grossing film of all time. JA:401. *Avatar* was nominated for nine Academy Awards, including Best Picture and Best Director, winning for Best Cinematography, Best Visual Effects, and Best Art Direction. JA:401.

## B.  Summary Of *Avatar*

*Avatar* is a science-fiction movie set on Pandora, the fertile moon of a giant gas planet in a distant star system.[5]  The film begins in 2148.  Although the atmosphere is toxic to humans, Pandora includes a rich, primeval rain forest inhabited by exotic creatures, giant trees, and the Na'vi, a humanoid race of nine-foot tall, blue-skinned natives with long tails.  These natives, who live in clans, enjoy a harmonious relationship with nature.  They make direct neural connections not only with various animals but also with Pandora's trees, which are linked together in a vast network.

---

[5] This summary applies to both the Scriptment and the movie, unless otherwise noted.  The Scriptment, the *Avatar* screenplay, and a DVD of the film are at JA:433-498, 1961-2144, Att:111.

7

Pandora is the only known source of the rare mineral "unobtanium." A corporation, RDA, has established a human colony ("Hell's Gate") to mine unobtanium. Protecting the company is a security operations team (Sec Ops), comprised of mercenaries. Particularly important to the story is the Omaticaya clan of Na'vi, whose village sits atop a major unobtanium deposit.

Also inside Hell's Gate are scientists studying the Na'vi and the moon's flora and fauna. The scientists work in an Avatar Program, by which human beings are temporarily "linked" into artificially cultured human/Na'vi bodies called "avatars" so that they can interact with the natives and study their culture. These scientists, led by Dr. Grace Augustine,[6] are at odds with RDA's administrators and Sec-Ops personnel. The administrators, led by Parker Selfridge,[7] consider the Avatar Program a disposable tool to pacify and manipulate the Na'vi.

*Avatar*'s plot centers on Jake Sully,[8] a paraplegic Marine veteran who, because he is a genetic match, is recruited from Earth for the Avatar Program to replace his dead twin brother as an avatar operator. During the six-year trip to Pandora, Jake is in a state of cryogenic sleep. Once on Pandora, Jake is approached by the villainous security officer Colonel Quaritch, who promises that

---

[6] Cameron combined two characters from the Scriptment, Grace Shipley and Dr. Brantley Giese.
[7] In the Scriptment, this character is *Carter* Selfridge.
[8] In the Scriptment, the protagonist's name is Josh.

8

if Jake provides RDA with information regarding the Na'vi, he will get his legs reconstructed.[9]

During his first venture outside the colony in avatar form, Jake is attacked by a ferocious creature and separated from Grace and another avatar operator, Dr. Norm Spellman. Unprotected from the dangerous Pandoran wildlife, Jake is rescued by a beautiful female Na'vi native, Neytiri,[10] who brings him to the Omaticaya Hometree. Gradually, Jake learns and embraces the Na'vi ways, is accepted as a clan member, and is betrothed to Neytiri.

The humans, led by Quaritch, want the Omaticayan clan to abandon their home, which sits on a vast unobtanium deposit. When the Na'vi refuse to leave, the humans attack them with flying gunships. The natives retreat to the Well of Souls, the nexus of Eywa,[11] the Pandoran world spirit. From there, Jake leads the Na'vi against the RDA invaders, with the help of native creatures roused by Eywa. In a final confrontation, Jake and Neytiri defeat Quaritch. Jake, through the power of Eywa, migrates permanently to his avatar body and becomes leader of the Omaticaya clan. He will never be human again. JA:1212-13.

---

[9] In the Scriptment, Jake does not agree to work for Colonel Quaritch but does plan to use his salary from the Avatar Program to pay for surgery.
[10] In Cameron's Scriptment, the character's name is Zuleika.
[11] In the Scriptment, Eywa is called Gaia.

9

Of course, *Avatar*'s plot is more complex than described above.  Defendants invite the Court's attention to the Scriptment and the DVD of the film, at  JA:433-498, Att:111.

## II.     PLAINTIFF'S *POLLINATION* AND *AQUATICA*

### A.     Plaintiff Bryant Moore

Plaintiff is not a professional writer; he works in the field of economic development.  JA:337, 2547.  He has never sold a screenplay or had one produced.  JA:3504-13.  He registered his screenplay *Aquatica*, which he began writing in 1992, with the U.S. Copyright Office in 1994.  JA:2149-2409.  He registered a revised version, *Aquapocalypse: Aquatica*, in 2006.  JA:2178-2409.

Plaintiff registered his screenplay *Pollination*, which he began writing in 2002, with the Copyright Office in 2003.  JA:1648-1785.  Plaintiff revised *Pollination* in 2006 and obtained a copyright registration for the revised version.  JA:1521-1643.[12]

### B.     Summary Of *Aquatica*

In Plaintiff's own words, *Aquatica* "is about a submarine commander's race with a powerful warlord alliance to find the Technopolis (an advanced research

---

[12] In 2005, Plaintiff registered some *Pollination*-related drawings ("*Pollination Art*") that he allegedly co-authored with his wife.  JA:2631-33, 2635-42.  Plaintiff claimed below that *Avatar* infringed some of these drawings.  He has not appealed the district court's rejection of that claim.  JA:4525-26.

center) of an aquatic, global dynasty that fell 1000 years before." JA:2549-50,

2578. Essentially, *Aquatica* is an undersea story about a search for a lost

civilization.

Specifically, *Aquatica* is a science-fiction action story set on an ocean planet

populated by humanoid and amphibious races living in domed underwater cities

and on islands.[13] JA:1210-11. The story depicts a conflict between two alliances.

The heroes are members of the Brodarian League, a group devoted to improving

the quality of life. The villains are ruthless warlords of the Gavadeen Alliance.

Among other outrages, these warlords practice brain extraction, using their

enemies' brains like computers. Their goal is total domination. Because *Aquatica*

is set on an ocean planet, the antagonists fight with large submarines and fleets of

aqua-jets or mini-subs.

The planet was once dominated by the Baruda Dynasty, which ruled for 900

years and developed advanced weapons like killer algae, an anti-matter

disintegration cloud, and a quantum torpedo. The secrets of these powerful

weapons, recorded in an ancient computer language, are hidden in a lost

underwater city known as the "Technopolis." Both the Brodarians and the

Gavadeens seek the Technopolis and the ancient weapons that will determine the

world's fate.

---

[13] The *Aquatica* screenplay is in the Joint Appendix at JA:2149-2277.

11

The hero is Torin Gato, a Brodarian warrior who was once a technologist devoted to peaceful resistance. Torin left the Technology Corps – and disappointed his friend, Dr. Octoria Hillia – after becoming convinced that the Gavadeen warlords could not be defeated by peaceful means. Torin's main adversary is Nardus, an ambitious Gavadeen who slaughters his way to becoming "Grandi" of the Gavadeens and who captures Octoria's father, Dr. Dirk Hillia, and extracts his brain to obtain the ancient knowledge of the Baruda Dynasty.

Torin finds the Technopolis, located near a giant underwater cavern containing, among other things, an aquatic forest of glowing, tree-like vegetation. Torin's discovery leads to a climactic underwater battle in which he and Octoria disable the Gavadeens' quantum torpedoes and kill Nardus. With the power derived from the discovery of the ancient Technopolis, the last warlord stronghold will soon be subdued.

### C.    Summary Of *Pollination*

*Pollination* is the story of a battle for control of Earth by two groups of warring humans with special powers. JA:1211-12. Plaintiff has described *Pollination* as involving an "ancient warrior order who have high-jacked the photosynthesis process by nurturing varieties of unique pollen which continuously spawn 'alien,' non-periodic table, bio-chemical releasing flora, transforming the atmosphere and certain forms of life on earth." JA:2537.

*Pollination* is set on Earth at a time when the planet has been transformed into a colossal "Mega-Forest" of giant trees.[14]  JA:2584.  This transformation was caused by "Pollinators," an ancient group of humans that have special powers and sometimes have green, filamentous skin.  The Pollinators at first nurtured pollen to grow crops, but then became intoxicated with power.  They seek to complete the metamorphosis of the planet through the release of "bio-vapor," which will alter photosynthesis and make the atmosphere unbreathable.  Surviving humans will become "living soil" for plants that will grow from their bodies.

Opposed to the Pollinators are the "Descendants," a group trying to preserve human life on Earth.  The Descendants live in skyscraper-filled cities built in giant bowls perched atop the Mega-Forest.  They can employ "genetic memory" to access the inherited knowledge and experience of their ancestors.

*Pollination*'s hero is Daniel Gimil, a Descendant, who joins with Ninurta, a warrior woman, to fight the Pollinators.  Ninurta does not know she is a Descendant until Gimil reveals that her forearm has the same mysterious symbols as his.  He demonstrates this by pressing their arms together so that they can experience genetic memory and better understand how to fight the Pollinators.  With Ninurta and other Descendants, Gimil defeats the Pollinator leader Merrick Grith by discovering the biological process by which the villains are transforming

---

[14] The *Pollination* screenplay is at JA:1648-1785.

13

the atmosphere.  Through genetic memory, Gimil and Ninurta learn how to

activate special seeds that prevent the release of bio-vapor.  After defeating Grith,

they plant the special seeds that save humanity.

### D.    Plaintiff's Access Claims

As stated above, Plaintiff claims that two of his works were infringed.  As to

the first, *Aquatica*, Plaintiff failed to proffer any evidence that anyone ever

submitted it to any Defendant before Cameron wrote the Scriptment.  As to the

second, *Pollination*, it is undisputed that Plaintiff wrote it several years ***after***

Cameron wrote the Scriptment.  Further, Plaintiff failed to adduce evidence that

Cameron or anyone else involved in creating *Avatar* ever saw either *Aquatica* or

*Pollination*.  JA:401, 761, 918, 1059-60, 1065, 1067, 1076, 1191.

### 1.    1994 Transmittal Of *Aquatica* To Gibson

Plaintiff contends that Defendants had access to *Aquatica* through a man

named Howard Gibson.  JA:342.  Gibson moved equipment as a "rigging grip" on

the set of a Cameron film, *True Lies*, in late 1993.  JA:761-62, 899, 2612-13, 2621-

22.  Gibson recalls that Cameron spoke to him only once, to tell him to get back to

work.  JA:3391.  Gibson never worked with Lightstorm or Cameron after his work

on *True Lies* ended.  JA:3391.  He never contributed creatively to any Cameron

project.  JA:403, 761-62, 3391.

Plaintiff first mailed *Aquatica* to Gibson in May 1994, approximately five months **after** Gibson finished working on *True Lies*. JA:762, 2551. Gibson never gave *Aquatica* to Cameron or to anyone else involved in creating *Avatar*. JA:2611, 2618-20. His only purported contact with Lightstorm after *True Lies* was in late 1994 at Lightstorm's office in Santa Monica, California, at which time he had an informal job interview with a man whose name he cannot recall. JA:2607-09, 2614-15. Gibson, who did not take *Aquatica* to that meeting, was not hired. JA:2610-11, 2615-16. Thus, there is no evidence that Gibson provided *Aquatica* to Cameron or Lightstorm.

### 2. 2003 Submissions

In 2003, at least seven years after Cameron wrote the *Avatar* Scriptment, Plaintiff mailed *Aquatica* and *Pollination* to Tom Cohen, a Lightstorm development executive who rarely interacted with Cameron.[15] JA:1066-67, 2541-43. Cohen had a third-party reader review the scripts and provide Lightstorm with "coverage" (brief summaries and recommendations on whether to "pass" or to attempt to acquire rights to the screenplays).[16] JA: 762, 1066-67. The third-party reader, Jason Coffee (now deceased), strongly recommended that Lightstorm pass

---

[15] Plaintiff never submitted the 2006 version of the scripts. JA:3505-06, 3510-11.

[16] The coverage was stored in an electronic database in which Lightstorm routinely kept screenplay coverage. Cohen testified that Cameron did not use the database. JA:4769. Cohen also testified that the database did not contain copies of screenplays themselves. JA:4715-16.

on (*i.e.*, reject) both screenplays. JA:762, 901-15, 1067. Coffee called *Aquatica* "a disaster" and *Pollination* "convoluted, needlessly complex, and complicated." JA:902; JA:913. As a result, Cohen passed. JA:1067, 2574-75. Cohen never read Plaintiff's scripts or gave them to Cameron or anyone else at Lightstorm. JA:403-04, 1067.[17] Neither Cohen nor Coffee contributed creatively to *Avatar*. JA:403-04, 1066.[18]

## STANDARD OF REVIEW

"[W]hen this court reviews the grant of summary judgment, it considers the record before the district court de novo and addresses the properly preserved arguments raised by the appellant and, if necessary, all properly preserved alternative bases for affirmance advanced by the appellee." *Beverati v. Smith*, 120 F.3d 500, 503 (4th Cir. 1997). "Summary judgment is justified if, from the totality of the evidence presented, … the court is satisfied that there is no genuine factual issue for trial and the moving party is entitled to judgment as a matter of law." *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Although a court must draw all reasonable inferences in favor of the non-moving

---

[17] Cohen, who now works for Marvel Studios, testified that Cameron "only attended a few meetings that [Cohen] was also present for during [Cohen's] entire [thirteen-year] tenure." JA:1066, 4740.

[18] Below, Plaintiff also claimed that Defendants had access to his scripts through two other individuals, Anthony Lancto and Sybil Danning, who both denied giving Plaintiff's work to any Defendant. JA:342-43, 344, 1069-71, 1073. On appeal, Plaintiff has abandoned these claims.

16

party, "it is the duty of the court to withdraw the case from the jury when the

necessary inference is so tenuous that it rests merely upon speculation and

conjecture." *Id.* at 818 (citation omitted).

## ARGUMENT

To prevail in an infringement case, a plaintiff must prove ownership of a

copyright in a work and copying by a defendant of original elements of the work.

*Feist Publ'ns Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Where direct

evidence of copying is absent, "a plaintiff 'may create a presumption of copying by

indirect evidence, establishing [1] that the defendant had access to the copyrighted

work and [2] that the defendant's work is 'substantially similar' to the protected

material.'" *Bldg. Graphics, Inc. v. Lennar Corp.*, 708 F.3d 573, 578 (4th Cir.

2013) (citations omitted). Summary judgment will be granted for the defendant if

no reasonable jury could find **both** access and substantial similarity. *Id.* at 580.

Even if a plaintiff establishes both access and substantial similarity, a defendant is

entitled to summary judgment where it is unrebutted that the defendant

independently created the allegedly infringing work. *E.g.*, *Comins v. Discovery*

*Communications, Inc.*, 200 F. Supp. 2d 512, 517 (D. Md. 2002). Summary

judgment for defendants in copyright cases is routinely granted where there is no

access, where there is no substantial similarity, or where the evidence of independent creation is unrebutted.[19]

The district court correctly held that Plaintiff failed to raise a dispute of fact regarding either access or substantial similarity. As a separate basis for granting summary judgment, the district court properly held that Cameron independently created *Avatar*.

Significantly, Plaintiff has failed to contest on appeal the district court's ruling on independent creation and has thus waived his right to challenge that dispositive ruling. Defendants therefore address that issue first.

---

[19] *See, e.g.*, *Harney v. Sony Pictures Television, Inc.*, 704 F.3d 173, 176 (1st Cir. 2013); *Blehm v. Jacobs*, 702 F.3d 1193, 1208 (10th Cir. 2012); *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1326 (11th Cir. 2012); *Muller v. Twentieth Century Fox Film Corp.*, 794 F. Supp. 2d 429, 442-44, 447-48 (S.D.N.Y. 2011), *aff'd*, 501 Fed. Appx. 81 (2d Cir. 2012); *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 624 (9th Cir. 2010); *Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 818 (C.D. Cal. 2010), *aff'd,* 438 Fed. Appx. 587 (9th Cir. 2011); *Bissoon-Dath v. Sony Comp. Entm't Am., Inc.*, 694 F. Supp. 2d 1071, 1081 (N.D. Cal. 2010), *aff'd and adopted without opinion by*, 653 F.3d 898 (9th Cir. 2011); *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1081-82 (9th Cir. 2006); *Armour v. Knowles*, 512 F.3d 147, 156 (5th Cir. 2007); *Stromback v. New Line Cinema*, 384 F.3d 283, 299 (6th Cir. 2004); *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1128 (9th Cir. 2002); *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1257, 1262 (11th Cir. 1999); *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996); *Eaton v. Nat'l Broad. Co.*, 972 F. Supp. 1019, 1026, 1029 (E.D. Va. 1997), *aff'd*, 145 F.3d 1324 (4th Cir. 1998).

18

## III.   IT WAS UNCONTROVERTED THAT DEFENDANTS INDEPENDENTLY CREATED *AVATAR*; PLAINTIFF HAS NOT CHALLENGED THAT RULING ON APPEAL.

"Evidence of substantial similarity and access presents a prima facie case of copying.  However, that presumption is rebutted where the defendant presents evidence that the allegedly infringing work was 'independently created.'"  *Watkins v. Chesapeake Custom Homes, L.L.C.*, 330 F. Supp. 2d 563, 575 (D. Md. 2004), *quoting Keeler Brass Co. v. Cont'l Brass Co.*, 862 F.2d 1063, 1066 (4th Cir. 1988). "The independent creation defense is not an affirmative defense, therefore the burden of persuasion remains on the plaintiff, who must rebut the evidence." *Watkins*, 330 F. Supp. 2d at 575.

The district court concluded that "Defendants present[ed] a strong case for independent creation that rebuts a presumption of copying."  JA:4536.  Plaintiff has failed to address this holding in his Notice of Appeal and his Opening Brief and has therefore waived his right to challenge it.  *See Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012) ("A party's failure to raise or discuss an issue in his brief is to be deemed an abandonment of that issue."); *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 656 n.7 (4th Cir. 2006) (Fed. R. App. P. 28(a)(9)(A) requires the "argument section of brief to contain 'appellant's contentions and the reasons for them, with citations to the authorities and parts of

the record on which the appellant relies'") . For this reason alone, the district

court's order should be affirmed.

Regardless, the district court correctly held that Plaintiff failed to raise a

material factual dispute regarding independent creation. Cameron submitted a

"comprehensive," unrebutted declaration setting forth his process for writing and

creating *Avatar*. JA:400-432, 4536. He meticulously traced the roots of the

*Avatar* project back to old high-school drawings of scenes that ended up in the

movie. JA:408-09, 509-11, 860-62. He referenced his film projects, like the

unproduced *Xenogenesis* from the 1970s, that contained the sources of many of

*Avatar*'s settings. JA:410-431, 533-538, 632-53. His earlier produced films,

including *The Abyss*, *Rambo II*, *The Terminator*, *Aliens*, and *Strange Days*, have

characters, themes, and moods on which he drew to create certain of *Avatar*'s

characters, themes and mood. JA:404-32, 509-656, 1237, 1263, 1284, 1363-71,

1507, 2418-34, Atts:112-13, 120-27. Other witnesses corroborated Cameron's

testimony. JA:759-60, 916-18, 1051-65. Because the evidence of independent

creation was undisputed, the district court properly granted summary judgment.[20]

JA:4536. *See Watkins*, 330 F. Supp. 2d at 575 (granting summary judgment where

it was undisputed that defendant prepared "drawings [that] reflect[ed] the same

---

[20] Two California courts also granted summary judgment in favor of Defendants on
the basis that Cameron independently created *Avatar*. *See Morawski v. Lightstorm
Entm't, Inc.*, No. CV-11-10294 MMM (JCGx) (C.D. Cal. Jan. 31, 2013); *Ryder v.
Lightstorm Entm't Inc.*, No. BC-474876 (Cal. Super. Ct. Jan. 7, 2014).

design features as the allegedly infringing" work prior to any interaction with the plaintiff); *Comins*, 200 F. Supp. 2d at 521 ("Defendants' unchallenged documentation of their independent creation of the Film provides yet another reason why summary judgment must be granted in their favor."); *see also Nat'l Med. Care, Inc. v. Espiritu*, 284 F. Supp. 2d 424, 438 (S.D. W. Va. 2003) (preliminary injunction denied based on evidence of independent creation).

## IV.    DEFENDANTS HAD NO ACCESS TO PLAINTIFF'S SCREENPLAYS.

The district court's order should be affirmed for a separate reason: Plaintiff failed to raise a genuine dispute regarding access.  To establish access, "'a plaintiff must prove that the person who created the allegedly infringing work had a reasonable opportunity to view the copyrighted work *before* creating the infringing work.'"[21]  *Bldg. Graphics*, 708 F.3d at 578-79, *quoting Armour*, 512 F.3d at 152-53 (emphasis added).  "A *mere* possibility that such an opportunity could have arisen will not suffice.  Rather, it must be *reasonably* possible that the paths of the

---

[21] Where a plaintiff cannot prove access, courts may nevertheless infer access where "striking similarities" exist between the works.  *Bouchat v. Baltimore Ravens, Inc.*, 241 F.3d 350, 356 (4th Cir. 2001).  Two works are strikingly similar only when they so resemble one another as to "preclude any reasonable possibility of independent creation" of the allegedly infringing work.  *Id.*, *quoting Gaste v. Kaiserman*, 863 F.2d 1061, 1068 (2d Cir. 1988).  Although Plaintiff argued below that *Avatar* and his screenplays are strikingly similar, he has waived the issue on appeal because he did not raise it in his Opening Brief.  Regardless, as the district court held, there are no striking similarities here.  Indeed, the works are not even substantially similar.  *See* section V *infra*.

21

infringer and the infringed work crossed." *Towler v. Sayles*, 76 F.3d 579, 582 (4th Cir. 1996) (emphasis added). A plaintiff cannot avoid summary judgment on access by relying on "unsatisfactory speculation and conjecture" or "[t]ortuous chain[s] of hypothetical transmittals." *Id.*

### A.    Defendants Did Not Have Access To *Aquatica* Through Gibson.

In a half-hearted footnote, Plaintiff argues that Defendants had access to *Aquatica* through his 1994 transmittal to third-party Howard Gibson, who worked as a "rigging grip" on *True Lies* in 1993. OB:16, n.6, JA:761-62. The undisputed evidence demonstrates precisely the opposite. When asked at deposition whether he was "certain" that he did not provide Cameron with a copy of *Aquatica*, Gibson testified: "Mr. Cameron, I didn't give him anything." JA:2617-18. When asked whether he provided a copy of *Aquatica* in any form to anyone at Lightstorm, Gibson testified: "I did not." JA:2618. This testimony forecloses any argument that Defendants received *Aquatica* through Gibson. *See Eaton*, 972 F. Supp. at 1024-25 ("a copyright plaintiff cannot base her opposition to summary judgment entirely on the hope that a fact finder will disbelieve the persons who have submitted affidavits on issues of access").

Plaintiff speculates that Gibson may have given a copy of *Aquatica* to someone at Lightstorm when Gibson purportedly went to Lightstorm's office in late 1994 seeking a job. OB:16, n. 6. However, Gibson testified that he did not

bring *Aquatica* to the meeting.  JA:3347-48, 3352.  Plaintiff "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."  *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).  Courts have granted summary judgment to defendants in cases involving similar rank speculation.  *E.g.*, *Ferguson v. Nat'l Broad. Co., Inc.*, 584 F.2d 111, 113 (5th Cir. 1978); *Gable*, 727 F. Supp. 2d at 824-31; *Meta-Film Associates, Inc. v. MCA, Inc.*, 586 F. Supp. 1346, 1358 (C.D. Cal. 1984).

    In short, Plaintiff failed to proffer any evidence that Defendants had access to his works through Gibson.

##    B.    Plaintiff's 2003 Submissions Cannot Establish Access Because Cameron Completed The *Avatar* Scriptment Seven Years Earlier.

    As noted, to establish access "a plaintiff must prove that the person who created the allegedly infringing work had a reasonable opportunity to view the [plaintiff's] work ***before*** creating the [allegedly] infringing work."  *Bldg. Graphics*, 708 F.3d at 578-79 (emphasis added) (citation omitted).  *Accord Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1054 (C.D. Cal. 2010).  Here, Plaintiff failed to offer even a *scintilla* of proof to refute the unrebutted evidence that Cameron completed the *Avatar* Scriptment by no later than March

1996, years before the 2003 submissions of Plaintiff's scripts.[22]  JA:402, 759, 764-859, 916-1060, 1075-1194.

As the district court concluded, and as Defendants' experts opined, the Scriptment contains the plot, settings, characters, sequence of events, themes, mood and pace of the *Avatar* story.[23]  JA:1214-15, 1364, 1374, 4521-22.  Because it was undisputed that the Scriptment was completed at least seven years before Plaintiff submitted his screenplays to Lightstorm, the district court correctly found that there was no access prior to the creation of *Avatar*.  JA:4522.  *See Armour*, 512 F.3d at 154 n.14 ("infringement [is] not possible where [the] allegedly infringing work is created before receipt of the allegedly copied work"); *Grubb v. KMS Patriots, L.P.*, 88 F.3d 1, 4 (1st Cir. 1996) ("Grubb does not just have to show that Loh had access to Grubb's work; Grubb has to show that Loh had access to Grubb's work before Loh created the Patriots' New Logo.").

---

[22] Plaintiff makes the absurd argument (OB:15) that the Scriptment is not authentic because Fox did not reference it as preexisting material on a copyright registration application for the *Avatar* Screenplay.  Plaintiff asks the Court to ignore the undisputed evidence – including contemporaneous documentation and several sworn declarations of third parties – establishing that the Scriptment was written and circulated by no later than March 1996.  Omission of a reference on a copyright registration application could in no way obviate the overwhelming, uncontroverted evidence that third parties received the Scriptment in 1996.  Moreover, Plaintiff concedes that Fox corrected the registration before he ever asserted any claim.

[23] On appeal, Plaintiff has waived his right to contest this ruling.  Indeed, he only points to one element of the *Avatar* movie that was purportedly not in the Scriptment.  *See* OB:25; page 45, *infra*.

### C. Even In The Absence Of The Scriptment, Plaintiff's 2003 Submissions Could Not Establish Access Because *Avatar*'s Creators Never Had A Reasonable Opportunity To View Plaintiff's Screenplays.

As discussed, the district court properly granted summary judgment because Cameron created *Avatar* years before Plaintiff's 2003 submissions of his screenplays. But even assuming *arguendo* Plaintiff's baseless challenge of the Scriptment's authenticity had any merit, Plaintiff's access argument would still fail because he proffered no evidence that the creators of *Avatar* had access to his works even by virtue of the 2003 submissions. JA:4525.

Plaintiff seeks to establish access under the "corporate receipt doctrine." OB:17. However, courts "have rejected 'bare corporate receipt' as sufficient proof of access, requiring plaintiffs to introduce some evidence that it was 'reasonably possible that the paths of the infringer and the infringed work crossed.'" *Jones v. Blige*, 558 F.3d 485, 493 (6th Cir. 2009), *quoting Towler*, 76 F.3d at 582. A court may infer access only if someone with a "close relationship" to the alleged infringer received the allegedly infringed work, such as a person who "supervises or works in the same department as the infringer or contributes creative ideas to him.'" *Towler*, 76 F.3d at 583 (emphasis added).

It was uncontroverted that Tom Cohen, who received Plaintiff's scripts in 2003, played no role in creating *Avatar* and "had very limited interaction with James Cameron." JA:1066. It was also uncontroverted that Cohen never read

25

Plaintiff's screenplays.  JA:1067.  Further, Cameron "only attended a few meetings that [Cohen] was also present for during [Cohen's] entire [thirteen-year] tenure." JA:1066.  Thus, Plaintiff failed to proffer evidence that Cohen and Cameron had a "close" working relationship or that Cohen contributed creative ideas to Cameron. *Towler*, 76 F.3d at 583.[24]  Neither did Plaintiff proffer evidence that anyone else involved in creating *Avatar* ever even heard of Plaintiff's screenplays before this litigation.  Indeed, they did not.  JA:401, 761, 918, 1059-60, 1065-67, 1076, 1191.

Plaintiff speculates that Cameron **could have** obtained Plaintiff's screenplays from a storage room 80 feet away where Lightstorm kept some submissions from writers (the "script library").  OB:6, 16; JA:4743, 4819.  However, Cohen testified that he would not have put Plaintiff's scripts in the library; rather, he would have returned them after rejecting them, as was his customary practice.  JA:3990, 4786.  *See Vantage Point, Inc. v. Parker Bros., Inc.*,

---

[24] This distinguishes *Moore v. Columbia Pictures Indus., Inc.*, 972 F.2d 939, 942-45 (8th Cir. 1999), on which Plaintiff relies.  There, the plaintiff's work was provided to a record-label executive who was a close personal friend of the writers of the allegedly infringing song.  Although the executive was not directly involved in creating the allegedly infringing song, she had promised to provide a copy of the plaintiff's song to her direct supervisor, who was involved in the creation of the allegedly infringing song and regularly contributed to the defendant writers' creative process.  The lack of a close relationship between Cohen and Cameron also distinguishes this case from *Bouchat v. Baltimore Ravens, Inc.*, 228 F.3d 489, 492-93 (4th Cir. 2000), where the intermediary told the plaintiff he would pass the allegedly infringed drawings to the defendant.  Here, Cohen never offered to give the script to Cameron.  JA:4523-24.

26

529 F. Supp. 1204, 1212 (E.D.N.Y. 1981) (corporate practices may negate a plaintiff's speculation regarding access by alleged infringer).[25]

***

For each of these reasons, the Court should affirm the district court's summary judgment order based on lack of access.

## V. *AVATAR* IS NOT SUBSTANTIALLY SIMILAR TO PLAINTIFF'S SCREENPLAYS.

Again, the Court could affirm on either or both of the two grounds discussed above. The Court can and should affirm for yet another separate reason – as a matter of law, the works are not substantially similar in protected expression.

In determining whether two works are substantially similar, a plaintiff must satisfy both an "extrinsic" (or "objective") test and an "intrinsic" (or "subjective") test. *Dawson v. Hinshaw Music Inc.*, 905 F.2d 731, 733 (4th Cir. 1990), *citing Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984). "First, the court must determine whether the two works are 'extrinsically similar because they contain substantially similar ideas that are subject to copyright protection.'" *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 801 (4th Cir. 2001), *quoting Towler*,

---

[25] Even if the screenplays had been in the library, Plaintiff's conjecture that Cameron **might** have found them there could not establish access. *See Eaton*, 972 F. Supp. at 1025 (theory that alleged infringer "'rummaged' through [the script recipient's] 'unlocked cabinet' for her script" was "mere conjecture"). Plaintiff's claim (OB:16, 35) that his screenplays "were in Lightstorm's electronic database" is also inaccurate. Only the **coverage** was in the database. JA:4715-16.

27

76 F.3d at 583.  "[S]econd, the court must ask whether the works are 'intrinsically similar' in the sense that they express those ideas in a substantially similar manner from the perspective of the intended audience of the work." *Lyons*, 243 F.3d at 801.  Courts within this Circuit "routinely grant" summary judgment for defendants based on a lack of substantial similarity.  *E.g.*, *Comins*, 200 F. Supp. 2d at 518-19; *Eaton*, 972 F. Supp. at 1026-27.

The heart of Plaintiff's appeal is that this Circuit should abandon its established substantial similarity test because (i) different circuits approach the issue slightly differently; (ii) some commenters have criticized the different approaches; and (iii) Plaintiff prefers the long-ago repudiated approach of *Arnstein v. Porter*, 154 F.2d 464 (2d Cir. 1946) – even repudiated by the Second Circuit itself – which would deny summary judgment if there was "the slightest doubt as to the facts," rather than the absence of a genuine dispute of material fact.[26]  *See*

---

[26] The *Arnstein* test is no longer followed.  *See Ferguson*, 584 F.2d at 114 ("*Arnstein* … is no longer good law."); *Scott v. Paramount Pictures Corp.*, 449 F. Supp. 518, 520 (D.D.C. 1978) ("*Arnstein* has lost its vitality by subsequent rulings.").  Indeed, the Second Circuit itself has for decades routinely affirmed summary judgment for defendants on the ground that the works at issue are not substantially similar.  *See, e.g., Muller v. Twentieth Century Fox Film Corp.*, 794 F. Supp. 2d 429, 442-44, 447-48 (S.D.N.Y. 2011), *aff'd*, 501 Fed. Appx. 81 (2d Cir. 2012); *Williams*, 84 F.3d at 582; *Warner Bros. v. Am. Broad. Cos.*, 720 F. 2d 231, 235 (2d Cir. 1983); *Hoehling v. Universal City Studios, Inc.*, 618 F. 2d 972, 977 (2d Cir. 1980).  Regardless, even *Arnstein* stated that cases "arise in which absence of similarities is so patent that a summary judgment for defendant would be correct."  Summary judgment would be appropriate here even under that antiquated test.

OB:10-14.  Plaintiff seeks to avoid this Circuit's established test for substantial similarity for an obvious reason – he cannot satisfy it.  Of course, because a panel of this Court cannot discard a test that a prior panel articulated (*see Capital Produce Co. v. United States*, 930 F.2d 1077, 1079 (4th Cir. 1991)), the Court must apply the extrinsic and intrinsic tests as set forth in prior opinions of the Fourth Circuit.

### A.    *Avatar* Is Not Substantially Similar To Plaintiff's Works Under The Extrinsic Test.

Under the extrinsic test, a plaintiff must establish that a reasonable jury could find that particular similarities in expression exist between the plots, themes, dialogue, moods, settings, pace, characters, and sequences of events in the two works at issue.  *Funky Films*, 462 F.3d at 1082; *Towler*, 76 F.3d at 584.  When applying the extrinsic test, expert testimony may be instructive.[27]  *Towler*, 76 F.3d at 583.

---

[27] Defendants submitted three detailed expert reports, all concluding that there is no substantial similarity between *Avatar* and Plaintiff's works.  JA:1199-1515, Att:66.  Plaintiff's "experts" opined in a conclusory manner that substantial similarities exist between *Avatar* and Plaintiff's works but that testimony does not create a genuine disputed fact because, *inter alia*, the experts relied on flawed methodologies.  *See Goldberg v. Cameron*, 787 F. Supp. 2d 1013, 1021-22 (N.D. Cal. 2011) (summary judgment for defendants where plaintiff's expert's opinion was based on unprotectable elements of the works); *see also McRae v. Smith*, 968 F. Supp. 559, 567 (D. Colo. 1997) (introducing unsupportable expert testimony does not create issue of fact).  The district court denied Defendants' motion to strike the testimony as moot.  JA:4537.  However, this Court may affirm on any ground in the record.  *U.S. v. Aparicio-Soria*, 740 F.3d 152, 154 (4th Cir. 2014).

"[O]f course, general ideas, themes, or plots are not eligible for copyright protection." *Eaton*, 972 F. Supp. at 1027. So, before comparing the works under the extrinsic test, a court must filter out unprotected elements, including "*scènes à faire*." *Bisson-Dath*, 694 F. Supp. 2d at 1081. *Scènes à faire* are elements that "necessarily result from the choice of a setting or situation[.]" *Williams*, 84 F.3d at 587. For example, when both works involve an underwater world, "[s]uch similarities as using a sand dollar as currency, foods made of seaweed, seahorses for transportation and plates made of oysters or mother of pearl are not protected similarities of expression, but are more accurately characterizations that naturally follow from the common theme of an underwater civilization." *Evans v. Wallace Berrie & Co., Inc.*, 681 F. Supp. 813, 817 (S.D. Fla. 1988).[28]

Moreover, "where an element occurs both in the defendant's prior work and the plaintiff's prior work, no inference of copying can be drawn." *Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 326 (6th Cir. 2004). This is because "where [a] defendant owns a prior work containing the same elements, he has no reason, beyond the illicit thrill of copyright infringement, to copy wrongfully from another what he could legally copy from himself." *Id.*

---

[28] Plaintiff's conclusory assertion that the district court's "search for *scènes à faire*" was "incompatible with summary judgment" is unsupported by any citation or explanation whatsoever. *See* OB:35. In reality, the district court's analysis of the unprotected elements of Plaintiff's works was supported by the case law and by the testimony of Defendants' experts, who discussed at length the relevant prior art. JA:1199--1515, Att:66, 4516-4533.

30

Because the *Avatar* Scriptment pre-dates Plaintiff's 2003 submissions to Lightstorm, Plaintiff cannot base his infringement claims on content appearing in both the Scriptment and the *Avatar* film, even assuming *arguendo* that *Avatar*'s creators received the scripts in 2003. *See id.* ("[W]e hold that elements of a copyright defendant's work that were created prior to access to a plaintiff's work are to be filtered out at the first stage of substantial-similarity analysis, just as non-protectible elements are."); *Sportsmans Warehouse, Inc. v. Fair*, 576 F. Supp. 2d 1175, 1181 (D. Colo. 2008) (same); *Benjamin v. Walt Disney Co.*, No. CV05-2280GPS, 2007 U.S. Dist. LEXIS 91710, at *11 (C.D. Cal. June 5, 2007) (filtering out elements in defendants' film treatment prepared before the first date of possible access). The district court correctly concluded, and Defendants' experts opined, that the Scriptment contains the same plot, settings, sequence of events, characters, themes, moods and pace as the film. JA:4522, 1214-15, 1237, 1245, 1252, 1364, 1373-74, 1382, 1402-04, 1409, 1412, 1435, 1439. Plaintiff has not challenged this conclusion in his Opening Brief (nor could he, since the Scriptment indeed contains the same extrinsic elements found in the movie). Given this waiver, the Court should affirm summary judgment under the extrinsic test based on the prior creation of the Scriptment alone.

Regardless, as the district court concluded, even without filtering elements of *Avatar* that are contained in the Scriptment, there is no substantial

31

similarity between the works at issue. Apart from the most general, trite and inconsequential commonalities, there is no similarity between the works whatsoever.

### 1. *Avatar* Is Not Substantially Similar To *Pollination*.

*Plot.* A court must "look beyond the vague, abstracted idea of a general plot" when assessing similarities. *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985). Conclusory allegations of similarity are insufficient where close inspection reveals that two works "tell very different stories." *Muller*, 794 F. Supp. 2d at 433.

As the district court held, *Pollination* and *Avatar* tell fundamentally different stories even at the highest level of generality. JA:4529, 1243-45, 1372-1380. *Avatar* is a "scientific romance" (JA:1345-51) about a down-and-out paraplegic ex-Marine named Jake Sully, who, at the request of the mining conglomerate RDA, travels to the distant moon Pandora to participate in the Avatar Program. In the Program, human scientists use cutting-edge technology to remotely operate biologically engineered human/Na'vi hybrid bodies, called avatars. JA:1243-44.

*Avatar* has two primary story arcs. First, it depicts the military-industrial machinations of RDA and Sec-Ops, which seek to displace the Na'vi natives and destroy their precious ecosystem so as to have uninhibited access to unobtanium through strip mining. Second, Jake, through his avatar, spends weeks learning and

32

embracing the Na'vi way of life, and falling in love with Neytiri, the Omaticaya people, and Pandora itself. Despite Sec-Ops' promise to pay for surgery to cure his paraplegia in exchange for helping to displace the Na'vi, Jake eventually chooses to side with the Na'vi and the Avatar Program scientists. Ultimately, Jake leads the Na'vi in battle against RDA, expels most of the humans from Pandora, and opts to live permanently in his avatar body. JA1243-45, 1372-80.

In contrast, *Pollination* is a "post-apocalyptic bioterror" story about two sects of humans, the Pollinators and the Descendants, who have been at war on Earth since pre-historic times. JA:1320, 1326-36. *Pollination* tells the story of how the Descendants' War Chief, Daniel Gimil, comes to partner with another Descendant, Ninurta, to defeat the Pollinators and prevent the destruction of human civilization. By drinking special tea and touching their forearms together, they experience genetic memories of long-passed battles, through which they discover the Pollinators' weakness – namely that planting special seeds will foil the Pollinators' plot to stoke a "bio-vapor" that causes gigantic Mega-Forests to grow. The Descendants succeed, and the Mega-Forests are replaced with benign trees. There are no avatars in *Pollination*, no love story, and no hero who abandons his own race to live among indigenous natives. JA:1243, 1373.

That both *Pollination* and *Avatar* contain battles set amongst huge trees and bioluminescent plants does not make the works' plots substantially similar. As a

33

matter of law, these general similarities are insufficient to show copying of protected expression. *See Berkic*, 761 F.2d at 1293 ("General plot ideas … remain forever the common property of artistic mankind."); *Eaton*, 972 F. Supp. at 1027 ("general . . . plots are not eligible for copyright protection"). Indeed, courts have found plots far more similar than those at issue here to be legally dissimilar. *See, e.g.*, *Crichton*, 84 F.3d at 583 (works involved "an imaginary present day man-made animal park for dinosaurs and other pre-historic animals where ordinary people ... can, in presumed safety, visit, tour and observe the creatures in a natural but hi-tech controlled habitat"); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 456-58 (11th Cir. 1994) (works involved wealthy foreign princes coming to America in search of wife, parental interference, initial choice of inappropriate mate, ultimately wise choice of mate and return to native country); *Berkic*, 761 F.2d at 1293 (works involved young professionals investigating and exposing criminal organizations' schemes to murder young adults to remove and sell their organs); *Litchfield*, 736 F.2d at 1354-55 (works involved an alien with extraordinary powers who befriended child, was welcomed into a family, adopted human habits, thwarted evil-doers, and then returned to space).

**Sequence of events.** *Avatar* and *Pollination* do not have substantially similar sequences of events. JA1246-54, 1420-25. In *Avatar*, RDA representatives tell Jake that his identical twin brother died in a mugging and that they want him to

travel to the distant moon Pandora to take his brother's place in the Avatar Program because he is a biological match. After Jake agrees in exchange for a big pay-day, he spends nearly six years in a cryogenic sleep while traveling to Pandora. Once he arrives, he spends a significant amount of time training with, as well as befriending, both Sec-Ops soldiers and Avatar Program scientists before he encounters Neytiri and the other Na'vi. As he is welcomed by the Na'vi, he grows to care for the native race and appreciate their ways. Once Jake chooses to help the Na'vi and to turn against Sec-Ops, he tries to convince the Na'vi to retreat from Hometree to avoid confrontation with Sec-Ops. After the Na'vi reject Jake's efforts, RDA attacks and destroys Hometree, and Jake is imprisoned. This first large-scale battle does not take place until at least two-thirds into the movie. Upon escaping with the assistance of Trudy, a sympathetic Sec-Ops pilot, Jake returns to convince the Na'vi that they can defeat Sec-Ops if the Na'vi clans join together. A final battle, and ultimately victory for the Na'vi and the other creatures of Pandora, ensues. After a tribal ritual, Jake's consciousness is permanently transferred into his avatar body.

*Pollination* opens with Grith in a modern subway filled with dead bodies. He instructs Anther to attack Gimil. A fast-paced fight sequence ensues in an apartment building. Ninurta intervenes and then disappears. After Gimil leaves in an aircraft, Ninurta tracks him down, and the two meet on top of a building. Gimil

tells Ninurta that the markings on her arm mean that she is a Descendant.  He explains the history of the centuries-long war between the Pollinators and the Descendants to Ninurta and takes her to meet his leaders, Hadean and Hadeana. Once Gimil convinces the leaders to let him work with Ninurta, they go to a tea room and drink tea that induces genetic memories ("semblances").  Ninurta's introduction to the ways of the Descendants cannot last long, however, because Pollinators attack.

Meanwhile, Grith and Anther dupe Flytrap, the leader of the Pollinators, into vaporizing himself, empowering them.  They continue to stoke the bio-vapor in order to destroy human civilization.  However, Gimil and his team discover an abandoned school house where the Pollinators are growing flora from human bodies and disrupt the Pollinators' plans with the help of Elish, who discovers a seed resin that is an effective weapon against the Pollinators.  Undeterred, Grith decides to attack the Descendants' gardens and use them as a new home base. However, using their ability to experience semblances, Gimil and Ninurta realize that planting the seeds Elish identified will cause a new forest to grow and supplant the Mega-Forests.  Once Grith is defeated in battle, the seeds are planted and new forests grow.

These sequences of events are radically dissimilar.  *Pollination* begins with action sequences; *Avatar* begins with a long period of peaceful build up before any

fighting begins. Any abstract similarities between the sequences, *e.g.*, the hero and heroine meeting each other before bonding, do not give rise to substantial similarity. *See Funky Films*, 462 F.3d at 1077 (extrinsic test requires analysis of "the actual concrete elements that make up the sequence of events"); JA:1253, 416.

**Setting.** After a brief opening on the futuristic Earth of 2148, *Avatar* is set on Pandora, a distant moon that humans have colonized. Other than a relatively small encampment of humans, Pandora is a pristine natural wonderland inhabited by the Na'vi and myriad alien creatures and plants, including bioluminescent moss, trees, and creatures. JA:1261-62. In contrast, *Pollination* is set entirely on Earth, which has been overrun by Mega-Forests created by Pollinators who grow bioluminescent plants in a schoolhouse using human bodies as soil. Most human cities have been destroyed, but a few have been preserved in "super-structures" on the tree-top canopy of the Mega-Forests.[29] JA:1260, 1409. The cars, buildings and décor are frozen in a mixture of twentieth and twenty-first century style. There are no cars or buildings in the Na'vi's Pandoran world; they live in a lush rainforest. JA:1409-10.

Courts have repeatedly found a lack of substantial similarity in cases involving far more similar settings. *See, e.g.*, *Funky Films*, 462 F.3d at 1080

---

[29] Plaintiff's claim (OB:23) that the Hell's Gate compound on Pandora is a "forest dwelling" similar to *Pollination*'s skyscraper-filled cities is baseless. Hell's Gate is not in a forest, and describing Plaintiff's skyscraper-filled cities as forest dwellings is disingenuous.

(works involved family-run funeral homes); *Wild v. NBC Universal, Inc.*, 788 F. Supp. 2d 1083, 1099 (C.D. Cal. 2011) (works took place at "a bizarre, dark or threatening carnival"), *aff'd,* 513 F. Appx. 640 (9th Cir. 2013).

That *Pollination* and *Avatar* both contain huge trees in which some characters live (although in very different ways), as well as naturally occurring bioluminescence, does not render the works substantially similar in expression. JA:1262. *See Van*, No. 3:10-cv-01051, at 3 ("Comparisons noting beautiful and colorful planets away from earth, multiple-leveled homes in trees, scientific facilities, and ships from earth are not expressions of a particular copyrightable setting. Such settings are *scènes à faire* and not protected under Plaintiff's copyright."); *Tessler v. NBC Universal, Inc.*, No. 2:08cv234, 2008 U.S. Dist. LEXIS 108353 (E.D. Va. Dec. 5, 2008), *adopted in relevant part by,* 2009 U.S. Dist. LEXIS 27345, at *15 (E.D. Va. Mar. 31, 2009), *aff'd*, 364 Fed. Appx. 5 (4th Cir. Feb. 4, 2010) (no copyright protection for scenes in a home and doctor's office).

Moreover, setting a science-fiction story among huge trees is a *scène à faire*. Numerous works, including *Flash Gordon*, *Return of the Jedi* and *Fellowship of the Ring* (which Plaintiff cited as a "reference" for *Pollination*) depict characters living in huge trees. JA:1262-65, 1318, 1335-38, 1411-12, 2436-37, 2440-42, 2454-60, 2552-53, 2584. And Plaintiff's "super-structures" containing "skyscraper

38

filled cities" in a "tree-top canopy" resemble the cities depicted in *Flash Gordon* far more than they resemble *Avatar*'s Hometree, which contains no skyscrapers or buildings at all.  JA:1264-65, 1318, 1411, 2454-60, 2588, 2652.  Regardless, the images of huge trees in *Avatar* are derivative of drawings Cameron did decades earlier.  JA:408-09, 510-11, 861-62.

Likewise, bioluminescence is not only a naturally occurring phenomenon, it is also a *scène à faire* commonly found in science-fiction and fantasy works, including *Twenty Thousand Leagues Under the Seas*, *Fantasia*, and Cameron's own earlier works, such as *The Abyss* and *Xenogenesis*.  JA:411-13, 918, 1235, 1237, 1411-12, 2422-24, Att:112.  Additionally, the bioluminescent plants in *Avatar* and *Pollination* are dissimilar as a matter of law.  The plants in *Pollination*, which sprout from human bodies, are grown in an abandoned school house as genetic experiments.  In contrast, the widespread, glowing plants in *Avatar* are part of Pandora's indigenous landscape and grow naturally from the Pandoran soil.  JA:1266-67.

***Characters.***  "[O]nly distinctive characters are protectable," and courts must be careful "to slice or filter out" mere embodiments of stock ideas.  *Bissoon-Dath*, 694 F. Supp. 2d at 1088.  Thus, the fact that both works contain heroes, villains, and fantastical species, for example, does not render them substantially similar.  JA:1257, 1326.

39

Beyond the level of uncopyrightable abstraction, the specific characters in the works are dissimilar. JA:1254-60, 1381-1402. *Avatar*'s protagonist, Jake, is a down-and-out, paraplegic, wheel-chair-bound ex-Marine. A corporation presents him with an opportunity to travel to a distant moon to control a genetically engineered avatar and make enough money to cure his paraplegia. Once he arrives on Pandora he grows close to the Na'vi and his love interest, Neytiri. His changed perspective causes him to shift his allegiance from RDA to the Na'vi. JA:1255, 1382-85. In contrast, *Pollination*'s protagonist, Daniel Gimil, is the Descendants' War Chief. He is not disabled. JA:1498-99. He never inhabits an avatar. He never falls in love with an alien (or anyone else). His allegiance never waivers.[30] JA:1257.

*Avatar*'s Neytiri is the daughter of Mo'at and Eytukan, the leaders of her Na'vi clan. She is expected to marry Tsu'tey, but she falls in love with Jake instead. She is fundamentally different from *Pollination*'s Ninurta. JA:1386, 1388-89, 1495-98. Ninurta is a loner who fights against Pollinators on her own before joining Gimil and the other Descendants. She is not the daughter of the

---

[30] Plaintiff's contention that Jake, the hero of *Avatar*, is substantially similar to Flytrap, a *Pollination* villain, merely because both characters use wheelchairs shows how frivolous his allegations are. *See* OB:24.

Descendants' leaders, and she is not promised to another suitor whom she must reject in order to be with Gimil (with whom she never falls in love).[31]  JA:1254.

Mo'at and Eytukan of *Avatar*, Neytiri's parents, are married.  She is the clan's spiritual leader; he is the political leader.  JA:1402-03.  They are not from Earth.  JA:1499-50.  They live in and around Hometree on Pandora.  Siblings Hadean and Hadeana, the leaders of the Descendants in *Pollination*, who are not related to Ninurta, appear to share leadership tasks without any division between spiritual and political roles.  JA:1399.  Rather than living in the jungle in a gigantic tree, as do Mo'at and Eytukan, they live in a normal building with a roof-top garden.  JA:1258-59.  The fact that the characters are similar in age is immaterial.  *Eaton*, 972 F. Supp. at 1029 ("[T]he basic human traits that certain characters share, including age, sex, and occupation, are too general or too common to deserve copyright protection.") (quotes omitted).

Merrick Grith, *Pollination*'s main villain, has algae-like green skin.  He kills his boss, Flytrap, in order to seize power.  He hatches a plot to destroy human civilization because humans harm the environment.  JA:1255, 1395.  *Avatar*'s main villain, Miles Quaritch, is a human former Marine who leads Sec-Ops, a mercenary force paid to protect RDA on Pandora.  Quaritch does not kill his boss

---

[31] Plaintiff claims that Neytiri wears an arrowhead necklace that is substantially similar to a necklace worn by Ninurta.  OB:24.  In fact, Neytiri does not wear an arrowhead necklace.  JA:1497, 4941-43.

but instead works with him and carries out his orders. Rather than caring about the environment, Quaritch seeks to destroy it in order to support RDA's efforts to strip-mine unobtanium. JA:1256, 1394.

Dr. Grace Augustine, a human scientist who heads the Avatar Program and accompanies Jake in the field, is a central character in *Avatar* who the Na'vi unsuccessfully try to resuscitate after she is shot. JA:1256, 1393-94. Microscopist Dreg is a minor character in *Pollination* who performs scientific research for the Descendants and never dies. JA:1391

Trudy, a Sec-Ops soldier who switches sides to help Jake, is not substantially similar to Mitanni, Gimil's close companion and side-kick who never switches sides. JA:1254-56. The fact that "both are uniquely skilled to navigate the upper forest terrains" (OB:25) is an unprotected abstract idea that is expressed differently in the works. Trudy flies helicopters that are based on existing models, while Mitanni flies dissimilar "canopy crawlers." JA:1505-11, Att:66 fig. 26a-f.

Moreover, under the extrinsic test, courts consider characters with no counterparts in the other party's work. *See Funky Films*, 462 F.3d at 1079. *Avatar* contains major characters that have no counterpart in *Pollination*, including Norm Spellman (who trains with Jake in the Avatar Program and grows into a courageous fighter on the side of the Na'vi); Tsu'tey (a Na'vi warrior who was

42

Neytiri's fiancé and who tries to humiliate Jake before growing to respect him); and Eywa (the Na'vi deity made up of all living things).[32]  JA:1256, 1393.

*Themes.*  One of the main "themes" of *Avatar* is the conflict between the exploitative commercial greed of the human invaders and the traditional culture of the Na'vi, who live in a harmonious relationship with their unspoiled world. JA:1268.  This theme emerges from the hero "going native" to lead the Na'vi in driving off the brutal humans and falling in love with Neytiri.  JA:416, 1268, 1431-32.  *Pollination* is a post-apocalyptic horror story in which monstrous creatures threaten the future of humanity.  JA:1268-69.  No one in *Pollination* "goes native," falls in love with an alien, or fends off humans to preserve an alien world. JA:1431.

Plaintiff vaguely contends that both works positively portray "spiritual connections to the environment."  OB:22.  Such stock themes are not copyrightable and cannot form the basis for substantial similarity of expression.  *See Herzog*, 193 F.3d at 1259 ("The basic theme in both works is that the past has the power to influence the present.  This truism is not entitled to copyright protection...");  *Muller*, 794 F. Supp. 2d at 445 ("Any thematic similarities are incidental to the

---

[32] Plaintiff's claim that Eywa is substantially similar to the "godlike" bio-vapor from *Pollination* is frivolous.  OB:26.  The bio-vapor is a tool of evil used by the Pollinators to destroy life on Earth.  JA:1403-04.

43

idea of an expedition to a dangerous and remote location, or the stock theme of

action-adventure meets science-fiction, and accordingly are unprotected.").

    ***Dialogue.***  "[E]xtended similarity of dialogue [is] needed to support a claim

of substantial similarity."  *Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1450 (9th Cir.

1988).  No such similarity exists here.  JA:1272, 1427-30.  At most, the works

contain common, *di minimis* fragments, like the words "brain activity."  Such

"[o]rdinary phrases are not entitled to copyright protection."  *Narell v. Freeman*,

872 F.2d 907, 911 (9th Cir. 1989).  And, the words are used differently.  For

example, Plaintiff mischaracterizes the works when he claims that they use the

words "'spokes' and 'trampolines' in the exact same manner."  *See* OB:25.   In

fact, Plaintiff used the words to describe "inflatable sleds," whereas Cameron used

the words to describe "hammocks" in which the Na'vi sleep.   JA:1282, 1414.

    ***Mood.***  *Avatar* offers stretches of serenity that create an awe-inspiring,

visually beautiful, immersive experience on an alien world where the natives live

in harmony with their environment.  JA:1270, 1433.  Violent battles toward the

end of the film are used to unsettle the audience and to make them long for a return

to harmony.  JA:1433.  *Pollination* contains fight sequences throughout and

utilizes horror rather than serenity.  JA:1271.  Any similarity that emerges from the

fact that both works contain fight sequences cannot establish substantial similarity.

*See Olson*, 855 F.2d at 1451 (comic moods "are common to the genre of action-

adventure television series and movies and therefore do not demonstrate substantial similarity").

Plaintiff claims similarity in mood because "[t]he expression of affection Gimil shows for Ninurta is substantially similar to what Jake shows for Neytiri." OB:25.  However, there is no love story involving Gimil and Ninurta in *Pollination*, whereas Jake's love for Neytiri is a central part of *Avatar*'s plot that develops throughout the film and results in them bonding for life.  JA:1254.  Also, Plaintiff has no copyright over the abstract idea of "express[ing] affection."

Plaintiff also claims substantial similarity in mood because both works purportedly involve "ancestral memory."[33]  OB:26.  However, to the extent that both *Pollination* and *Avatar* depict the uncopyrightable idea of characters that can access their ancestors' memories, these depictions differ dramatically in copyrightable expression.  JA:1251, 1353.  *Pollination* involves characters who recall the experiences of their ancestors by drinking special tea or touching together birthmarks on their arms; the Na'vi in *Avatar* access their ancestors' voices by connecting tendrils in their hair to tendrils that dangle from a sacred tree. JA:1354.  The moods created by these scenes differ markedly.  In *Avatar*, the serene scene at the "Tree of Voices" reinforces the intimate connection that the Na'vi have to the Pandoran environment.  JA:2052-54.  In *Pollination*, the jarring,

---

[33] That term is never used in *Avatar*.

visually-oriented "semblances" that Gimil and Ninurta experience provide tactical and strategic information they can use to defeat the Pollinators.[34] JA:1212, 1354. Moreover, Plaintiff's claim that accessing the memories of others is not a common feature of science fiction stories is incorrect. Numerous works use this device, including the famous *Dune* series and the novelization of Cameron's 1989 film *The Abyss*. JA1251, 1353-55, 2465-66, 2472-83, 2489-91.

*Pace.* "The time period within which the movie is set is a factor for determining the pace of the movie." *Campbell v. The Walt Disney Co.*, 718 F. Supp. 2d 1108, 1115 (N.D. Cal. 2010). After Jake spends six years in cryogenic sleep traveling to Pandora, *Avatar* takes place over a period of months; *Pollination* apparently takes place over a number of days, except for flashbacks during "semblances." JA:1426. *Pollination* contains myriad fast-paced battle scenes with only a few moments of downtime; *Avatar* slowly builds until the first significant battle takes place two-thirds of the way into the movie. JA:1269-70, 1426. In any event, "to the extent Plaintiff alleges that the action rises and falls in a similar manner in both works, 'pace, without more, does not create an issue of overall substantial similarity between the works.'" *Id.*, *quoting Williams*, 84 F.3d at 590.

---

[34] "Ancestral memory" is the only concept from the *Avatar* film that Plaintiff identifies in his Opening Brief that is supposedly not contained in the Scriptment. OB:26. Although the concept is more central to the film, it is also contained in the Scriptment. *See* JA:1252.

Because *Avatar* and *Pollination* are not substantially similar under the extrinsic test, the Court should affirm.[35]

### 2.    *Avatar* Is Not Substantially Similar To *Aquatica*.

**Plot.**  *Aquatica* is about a Brodarian League effort to establish peace between underwater and island cities that are besieged by warlords of the Gavadeen Alliance.  JA:1216-17, 1373, 2549-50, 2580.  The Brodarian Nautical Corps are led by a soldier, Torin Gato.  The Tech. Corps are led by father and daughter scientists, Dirk and Octoria Hillia.  Gato and the Tech. Corps cooperate to vanquish the Gavadeen Alliance, led by Nardus, a soldier-scientist who seeks to advance scientific discovery at the expense of the general welfare.  Both the Brodarians and the Gavadeens are looking for a lost but highly advanced underwater city, Technopolis, where the keys to developing advanced weaponry rest for the taking.[36]  JA:1216-17, 1373.

---

[35] Plaintiff has not challenged the district court's holding that Plaintiff's *Pollination Art* drawings, which were never submitted to Defendants, are not substantially similar to anything in *Avatar*.  As the district court and Defendants' expert concluded, "[t]he subject matter, shapes, colors, materials, and arrangement of the representations" in the drawings and the imagery of *Avatar* are entirely dissimilar. JA:4527 (quoting *Cavalier v. Random House, Inc*., 297 F.3d 815, 826 (9th Cir. 2002)); JA:1483-1514, Att:66.

[36] Plaintiff asserts that the underwater "Technopolis" in *Aquatica* is not a city but rather than an ancient "science and research center."  OB:28.  Putting aside that the root word "polis" literally means "city" in Greek, even if Plaintiff were correct, there is no such underwater facility in *Avatar*.

47

In contrast, *Avatar* is a science fiction fantasy story about a paraplegic ex-Marine who is hired by a mining conglomerate to travel to a distant moon and operate the body of an avatar created using his dead brother's DNA. Jake's allegiance is initially torn between the Avatar Program and RDA, but his growing appreciation for the native Na'vi and love for Neytiri eventually inspire him to stop RDA from strip mining the Na'vi homeland, which is destroying the environment and community Jake has come to call home. JA:1217, 1373-34.

There are no warlords, cities, or underwater missions in *Avatar*. There is no love story in *Aquatica*, and nobody (let alone the main character) operates a genetically-engineered avatar body. Rather, Nardus genetically alters human-sized amphibians and eels, which he unleashes to attack the Broadarians. *Aquatica* and *Avatar* are not substantially similar in plot simply because both works involve soldiers and scientists and battles in alien worlds. JA:1216-20, 1225-26, 1391-94, 1373-80. Courts have held far more similar plots to be dissimilar as a matter of law. *See* cases cited at page 34, *supra*; *see also Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986) (both works "depict[ed] cockfights, drunks, stripped cars, prostitutes and rats; both feature[d] as central characters third- or fourth-generation Irish policemen who live in Queens and frequently drink; both show[ed] disgruntled, demoralized police officers and unsuccessful foot chases of fleeing criminals"); *Nelson v. Grisham*, 942 F. Supp. 649, 653 (D.D.C. 1996), *aff'd*, 132

48

F.3d 1481 (D.C. Cir. 1997) (*per curiam*) ("each of the books [included] the presence of the media, politicians, and jail house personnel [as well as depictions of the] frenzy with which last minute appeals are made by each of the attorneys").

***Sequence of events.***  Plaintiff lists and mischaracterizes random events from the works without any regard to the sequence in which they occur.  OB:29. *Avatar*'s sequence of events, discussed in detail above (*see* pages 34-36, *supra*), is nothing like the sequence in *Aquatica*.  JA:1220-27, 1420, 1423-26.  Plaintiff's work begins with Gato defeating a Gavadeen submarine in battle.  Next, Nardus seizes the ancient texts that provide the location of Technopolis from a Brodarian vessel.  After a meeting in the capital city of Brodaria with the Brodarian leader, Orkham, Gato sets out to locate Technopolis before Nardus can.  Although Gato believes the Brodarians have an advantage because Dr. Hillia –  who can translate the ancient texts – is on their side, the villains kidnap Hillia and extract his brain. After struggling to decipher the ancient texts and encountering resistance along the way, Gato decides to consult with a black-market trader, Lord Rane, who is known for cartography.  Rane helps Gato locate Technopolis, but Gato still has to defeat Nardus and his thugs, including genetically altered eels and frog-like men.  With the help of Dr. Hillia's daughter, Octoria, Lord Rane, and his side-kick Dylos, Gato defeats Nardus and restores peace to the realm.  Gato returns to Brodaria to

meet with Orkham.  As a matter of law, the sequences of events of *Avatar* and *Aquatica* are not substantially similar in protected expression.

**Settings.**  That *Avatar* and *Aquatica* both contain large rocks and cliffs, glowing plants, large trees, and scientific labs does not make them substantially similar in setting.  *See Muller*, 794 F. Supp. 2d at 446 (no similarity where "both works are primarily set in or near Antarctica, and both use an underground pyramid and archeological excavation settings").  All of these settings are common place in science fiction, including in Cameron's prior works.  JA:410-13, 423, 1237, 1335-38, 1342-45, 1370, 1449-51, 1458-59, 2429.

In fact, the works' settings are entirely different.  JA:1233-38, 1409-10 *Aquatica* is primarily set underwater; *Avatar* is primarily set above ground on a distant moon in a rainforest environment (with no underwater scenes).  *Aquatica* is set in alien cities; *Avatar* is set briefly on Earth in 2148, and then in a human mining compound and Na'vi villages in and around trees.  Although both works contain plants with "bioluminescence," the plants in *Aquatica* are in an underwater cavern, whereas the omnipresent glowing plants in *Avatar* are above ground.  Further, the two works use bioluminescent plants differently: *Aquatica* employs the plants for only one battle, while they are ubiquitous in *Avatar*.  JA:1412.

**Characters.**  The protagonists in *Aquatica* and *Avatar* are not substantially similar merely because Jake and Gato both join soldiering outfits that fight

50

alongside scientists in forests of large glowing plants. *See Jones v. CBS, Inc.*, 733 F. Supp. 748, 753 (S.D.N.Y. 1990) ("[O]nly a uniquely developed character with some degree of novelty is copyrightable."). Jake, a paraplegic, leaves behind a life on Earth to travel to Pandora as an avatar operator where the Na'vi welcome him into their clan. He undergoes a physical and spiritual transformation and falls in love with Neytiri. In contrast, in *Aquatica*, before the screenplay begins, Gato transfers from one Brodarian division (the Tech. Corps) to another Brodarian division (the Nautical Corps) because he wants to fight the Gavadeen Alliance rather than focusing on scientific ways to improve people's lives. He is a submarine commander, not an avatar operator. He does not fall in love with anyone, much less someone from a different planet, or otherwise "go native." He is not paraplegic. JA:1230-31, 1381-85.

Neither is *Avatar*'s Toruk Makto, the Na'vi ancestor who attained legendary status by taming and controlling a large winged creature and unifying the Na'vi clans, substantially similar to *Aquatica*'s Lord-Chancellor Orkham, who "brought the islands and the underwater cities together in a time of great crisis." Toruk Macto is a legendary figure from the past, whereas Orkham is an active participant in *Aquatica* in the present. JA:1228.

Neytiri, a Na'vi who falls in love with Jake, is not similar to Octoria Hillia, a scientist who worked with Gato in the Tech. Corps before being reunited with him

51

during the battles chronicled in *Aquatica*. Octoria and Gato never fall in love. She is not a nine-foot tall alien with blue skin and a tail. JA:1231-32, 1387-88.

Neither is Octoria substantially similar to *Avatar's* Dr. Grace Augustine. Whereas Hillia is a young scientist trying to follow in her father's footsteps, Augustine is a seasoned and experienced expert; there are no issues concerning her and her father. JA:1391-94. *See Smith v. Weinstein*, 578 F. Supp. 1297, 1303 (S.D.N.Y. 1984) ("[N]o character infringement claim can succeed unless plaintiff's original conception sufficiently developed the character, and defendants have copied this development and not merely the broader outlines."). The presence of scientists is not a similarity in protected expression. Scientists are commonplace in science fiction works. JA:1230, 1391.

*Pace.* After Jakes spends years in cryogenic sleep while travelling to Pandora, *Avatar* takes place over a number of months (as is confirmed by Jake's 98 daily video-diary entries), during which Jake becomes more immersed in the Pandoran world and less involved with his own species. *Aquatica*, which contains no similar period of immersion, takes place in a span of days. JA:1426. Although both works contain some fast-paced action sequences, such generic similarity cannot sustain a claim of substantial similarity of expression. JA:1239-40; *Williams*, 84 F.3d at 590.

***Themes.***  Themes like "saving the world, [or] the battle between good and evil" are "common themes and ideas throughout literature and are beyond any level of abstraction at which copyright protection might begin to attach." *Stromback*, 384 F.3d at 296-97.  Aside from an unprotectable general theme of good guys versus bad guys, the works' themes differ.  JA:1238-40, 1431-32. *Avatar* has a strong theme of romantic love.  *Aquatica* has no love story.  *Avatar* also has a "going native" theme that is absent in *Aquatica*.[37]  JA:1240.  *See* page 43 *supra*.

***Dialogue.***  Common usage of words, like "Eastern Sea" to refer to an eastern sea, does not result in substantial similarity in dialogue.  Such fragments are not protectable.  *See Johnson v. Gordon,* 409 F.3d 12, 24 (1st Cir. 2005) ("You're the One for Me" was "too trite to warrant copyright protection").[38]  Beyond such trivialities, the works share no common dialogue.  JA:1240-41, 1427-30.

---

[37] Plaintiff claims that the works' themes both involve "genetically-engineered creatures that are sent out on missions and fight."  OB:30.  However, the avatars in *Avatar* are genetically engineered such that controllers can operate an avatar body in order to interact with the Na'vi.  The avatar operators are good guys.  In contrast, Nardus' genetically-engineered monsters in *Aquatica* are not inhabited by others and are designed to kill the good guys.  In any case, the concept of genetically-engineered creatures that fight is a mere idea and not even a theme. JA:1365

[38] Many prior works contain references to an "Eastern Sea," including J.R.R. Tolkien's "Lord of the Rings" trilogy and C.S. Lewis' "Chronicles of Narnia" books.  JA:1283, 1415-16.  The concept of naming a "sea" after one of the four directions on the compass is hardly indicative of copying.  The "North Sea," the "South Seas," and the "East China Sea" are actual geographical places on Earth.

*Mood.* The moods in *Aquatica* and *Avatar* are not substantially similar merely because both include strange alien settings and people dying. JA:1320, 1433-34. Any such similarities arise out of the common genres of the works, namely action adventure and science-fiction. *See Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1177 (9th Cir. 2003) (similar moods of mystery "constitute *scènes à faire*, and merge with the idea of revealing magic tricks"). Aside from stock ideas, the moods of the works differ. Whereas *Aquatica*'s focus, from start to finish, is on fight sequences, *Avatar* offers stretches of serenity that create an immersive experience of an alien world. The battles at the end of the movie unsettle the audience and make them long for the return of harmony. There is never any harmony in *Aquatica*.

Because there is no substantial similarity between *Avatar* and *Aquatica* under the extrinsic test as a matter of law, the Court should affirm.

## B. *Avatar* Is Not Substantially Similar To Plaintiff's Works Under The Intrinsic Test.

Even if Plaintiff could satisfy the extrinsic test, which he cannot, affirmance would still be warranted: his substantial similarity claims fail under the intrinsic test. By conflating the extrinsic test and the intrinsic test and asserting that he satisfies the latter because he supposedly satisfies the former (OB:27, 33), Plaintiff

---

*See* THE AM. HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 579, 1236, 1724 (3d ed. 1992).

essentially concedes lack of intrinsic similarity by failing to address the issue. For yet another separate reason, this waiver warrants affirmance.

In any event, no issue of disputed fact exists in connection with the intrinsic test. In applying that test, a court "must ask whether the works are 'intrinsically similar' in the sense that they express [] ideas in a substantially similar manner from the perspective of the intended audience of the work." *Lyons*, 243 F.3d at 801. The question is whether an ordinary observer within the intended audience for two works would view the "total concept and feel" of the works as substantially similar. *Towler*, 76 F.3d at 581-82. Two works are intrinsically similar if such a "viewer's overwhelming impression [is] that the defendant's products are appropriations" despite any "differences in detail." *Universal Furniture v. Collezione Europa USA*, 618 F.3d 417, 437 (4th Cir. 2010) (citation omitted).

*Avatar* is a story about a human paraplegic who travels to space to operate an avatar body and then falls in love with an alien and ultimately chooses to battle the conglomerate that brought him there. In contrast, *Pollination* is about two sects of humans who have been fighting on Earth since pre-historic times over whether or not to destroy the human race by altering ecosystems and ridding the world of oxygen. *Pollination* is not set in space; is not a love story; and does not involve humans operating avatar bodies. No reasonable juror could conclude these works are intrinsically similar. *See Litchfield*, 736 F.2d at 1354-57 (works concerned

55

aliens with extraordinary powers who befriended children and then returned to their native worlds); *Grisham*, 942 F. Supp. at 654 (works involved lawyers representing murderers); *Arden v. Columbia Pictures Indus., Inc.*, 908 F. Supp. 1248, 1258 (S.D.N.Y 1995) (works were about a man trapped in a day that repeats itself).

Neither are *Aquatica* and *Avatar* substantially similar under the intrinsic test. *Aquatica* is about a soldier who fights alongside scientists to bring peace to underwater and island cities that are ruled by warlords and about a race between the warring groups to reach an ancient and lost underwater city where powerful weapons are stored. There is nothing remotely similar in *Avatar.* And unlike *Avatar*, *Aquatica* does not involve space travel; is not a love story; does not involve humans operating avatar bodies; and does not involve the main character "going native" and turning on his own people. No reasonable juror could conclude that *Avatar* and *Aquatica* are substantially similar under the intrinsic test. *See Scott-Blanton v. Universal City Studios Prod.*, *LLLP*, 539 F. Supp. 2d 191, 203-04 (D.D.C. 2008) (works involved married men having homosexual affairs); *Eaton*, 972 F. Supp. at 1030 (works involved romantic tension between employees of auto-repair garages); *Warner Bros.*, 720 F.2d at 240, 243 (works involved superheroes who wore costumes and capes); *Whitehead*, 53 F. Supp. 2d at 48-50 (works involved CIA agents).

## C.    There Are No Fragmented Literal Similarities Between *Avatar* And Plaintiff's Works.

"Fragmented literal similarity" exists where an infringer copies "only a small part of the copyrighted work but [does] so word-for-word.'" *Peter Letterese & Assoc. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1303 n.19 (11th Cir. 2008) (citation omitted).  This may rise to the level of substantial similarity "[i]f this fragmented copy is important to the copyrighted work, and of sufficient quantity."  *Id.*  "The dispositive question is whether the similarity goes to trivial or substantial elements.  The substantiality of the similarity is measured by considering the qualitative and quantitative significance of the copied portion in relation to the plaintiff's work as a whole."  *Newton v. Diamond*, 388 F.3d 1189, 1195 (9th Cir. 2003) (finding musical sampling of a few notes *de minimis*).

Although Plaintiff has waived the argument by failing to assert or support it in his Opening Brief, he makes a few conclusory references to supposed fragmented similarities.  OB:27.  The examples that Plaintiff cited below as fragmented literal similarities did not involve text that shared more than two consecutive words (*e.g.*, "Eastern Sea," "green eyes" and "three dimensional") in common.  JA:1283, 2531-35.  These coincidental trivialities are legally insignificant.  *See Murray Hill Publ'ns, Inc. v. ABC Comm., Inc.*, 264 F.3d 622, 633 (6th Cir. 2001) ("an insignificant part of a much larger work" is not enough); *Rokeach v. Avco Embassy Pictures Corp.*, No. 75-Civ.-49(CHT), 1978 U.S. Dist.

LEXIS 20101, at *19 n.3 (S.D.N.Y. Jan. 17, 1978) (copying of "sentence

fragments and a few words" was *de minimis*).

### D.    Plaintiff's Lists of Random Similarities Cannot Establish Substantial Similarity.

In a last ditch argument, Plaintiff cites *Metcalf v. Bochco*, 294 F.3d 1069,

1074 (9th Cir. 2002), for the proposition that "[t]he particular sequence in which an

author strings together a significant number of unprotectable elements can itself be

a protectable element."  OB:18.  However, "a combination of unprotectable

elements is eligible for copyright protection only if those elements are numerous

enough and their selection and arrangement original enough that their combination

constitutes an original work of authorship."  *Satava v. Lowry*, 323 F.3d 805, 811

(9th Cir. 2003).

Here, Plaintiff is not relying on the "particular sequence" in which he

combined, in an original manner, numerous and significant unprotectable elements.

Instead, at best, he proffers laundry lists of abstract, general, commonplace

purported similarities without regard to their sequence.[39]  JA:1275.  As courts

uniformly hold, such "a list comparing 'random similarities scattered throughout

the works' is 'inherently subjective and unreliable.'"  *Towler*, 76 F.3d at 584,

---

[39] Plaintiff filed such lists below, including in his 200-page "Statement of Disputed Facts." JA:2752-2948.  The Court need not wade through the opaque waters of this pointless, confusing document to affirm.  As Defendants showed in a motion to strike, which the district court deemed moot, the document is objectionable for numerous reasons, including under F.R.E. 403.  ECF:167-1.

*quoting Litchfield,* 736 F.2d at 1356.  Courts in this Circuit have routinely granted summary judgment in favor of defendants in cases like this.  *E.g.*, *Comins*, 200 F. Supp. 2d at 518-19 (rejecting plaintiff's list of alleged similarities between a book and a film); *Eaton*, 972 F. Supp. at 1026-27 (rejecting plaintiff's seventeen-page chart that compared random fragments of dialogue, scenes, and characteristics).[40] Plaintiff cannot create a genuine dispute of material fact by asking that the Court credit his deficient laundry lists of abstract similarities and mischaracterizations.

## CONCLUSION

The Court should affirm the district court's order.

DATE: September 10, 2014                ROBERT H. ROTSTEIN
                                        J. MATTHEW WILLIAMS
                                        MITCHELL SILBERBERG & KNUPP LLP


                                        By:    s/ Robert H. Rotstein
                                               Robert H. Rotstein
                                               *Attorneys for Defendants/Appellees*

---

[40] *See also Baby Buddies, Inc. v. Toys R Us, Inc.*, 611 F.3d 1308, 1316 (11th Cir. 2010); *Stromback*, 384 F.3d at 298; *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045-46 (9th Cir. 1994); *Herzog*, 193 F.3d at 1257; *Williams*, 84 F.3d at 590; *Sherman v. Jones*, 457 F. Supp. 2d 793, 801 (E.D. Mich. 2006).

59

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Fourth Circuit Rule 32-1, the enclosed brief is proportionately spaced, has a typeface of 14-point Times New Roman, including footnotes, and contains approximately 13,985 words.  Counsel relies on the word count of the computer program used to prepare this brief.

DATED:  September 10, 2014          ROBERT H. ROTSTEIN
                                   J. MATTHEW WILLIAMS
                                   MITCHELL SILBERBERG & KNUPP LLP


                                   By:    s/ Robert H. Rotstein_____
                                          Robert H. Rotstein
                                          *Attorneys for Defendants/Appellees*

60

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing **RESPONSE BRIEF**

and the attached **ADDENDUM** with the Clerk of the Court for the United States

Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on

September 10, 2014.  Counsel of record for Appellant Bryant Moore are registered

ECF users.


By:   s/ Robert H. Rotstein
      Robert H. Rotstein

61